UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,

v.

OHIO DEPARTMENT OF HIGHWAY SAFETY and Donald D. Cook, Director, Defendants–Appellees, Cross–Appellants.

Nos. 78–3306, 78–3307.

United States Court of Appeals, Sixth Circuit.

Argued July 9, 1980.

Decided Dec. 5, 1980.

James W. Moorman, Angus Macbeth, Robert L. Klarquist, Barbara H. Brandon, Anne S. Almy, James N. Cahan, Land & Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., James C. Cissell, U. S. Atty., Albert R. Ritcher, Asst. U. S. Atty., Columbus, Ohio, Thomas E. Ferguson, Auditor of State, John F. Birath, Jr., Bricker, Evatt, Barton & Eckler, Columbus, Ohio, for plaintiff–appellant, cross–appellee.

William J. Brown, Atty. Gen. of Ohio, Donald J. Guittar, Halstead L. Stettler, Asst. Attys. Gen., Columbus, Ohio, for defendants–appellees, cross–appellants.

G. Franklin Miller, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, for amicus curiae.

Before WEICK, LIVELY and MERRITT, Circuit Judges.

LIVELY, Circuit Judge.

This case arises under the Clean Air Act, as amended, (the Act) 42 U.S.C. § 7401, *et seq.*[1] The issue on appeal concerns the enforcement powers of the United States Environmental Protection Agency (EPA) against a state which fails to perform an act required of it by a provision of an implementation plan promulgated by EPA. The specific question to be decided is whether the State of Ohio is subject to the Act's enforcement provisions for its failure to deny registration to vehicles which have not passed inspection and maintenance emission tests required by an EPA–promulgated provision of the state implementation plan.

## I.

As required by the Act, the State of Ohio adopted an implementation plan for each air quality control region within the State and several metropolitan interstate regions. Upon finding that the Ohio plan was not adequate to assure attainment and maintenance of the primary standard for photo–chemical oxidants in the Cincinnati area, EPA denied approval to a portion of the Ohio plan. As permitted by section 110(c) of the Act, 42 U.S.C. § 7410(c), on November 8, 1973, EPA supplemented the state implementation plan by publishing a regulation which required a vehicle inspection and maintenance program for Cincinnati and Hamilton County, Ohio. 40 C.F.R. § 52.1878.

This regulation provides in part:

(e) After December 31, 1975, no program in the County of Hamilton, the City of Cincinnati, the State of Ohio shall allow the registration of title, or allow the operation on streets, roads, or highways under its control of any light–duty, spark–ignition–powered motor vehicle subject to the inspection program(s) established pursuant to this section that does not comply with the applicable standards and procedures, as defined in paragraph (d)(2) of this section. This shall not apply to the initial registration of new vehicles.

Upon adoption, this regulation became part of the Ohio implementation plan.[2]

Cincinnati and Hamilton County set up inspection facilities which complied with the requirements of the regulation. However, the State of Ohio has refused to withhold registration from vehicles which have not passed emission inspection. After issuing a notice of violation on March 15, 1976 and an order to comply on June 22, 1976, EPA brought this action in the district court pursuant to section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1), on November 18, 1976. Section 113(a)(1) (then codified at 42 U.S.C. § 1857c–8(a)(1)) provides:

§ 1857c–8. **Federal enforcement procedures**

(a) Determination of violation of applicable implementation plan or standard; notification of violator; issuance of compliance order or initiation of civil action upon failure to correct; effect of compliance order; contents of compliance order

(1) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator

---

1. The Clean Air Act was first enacted in 1955 and there have been frequent amendments, most notably in 1970 and 1977. At the time this litigation began the Act was codified at 42 U.S.C. § 1857, *et seq.* The 1977 amendments rearranged many provisions of the Act and recodified it at 42 U.S.C. § 7401, *et seq.*

2. Section 52.1878(e) was not challenged by a petition for review. Thus, we treat it as a lawful regulation and are concerned only with the proper interpretation of the regulation, the validity of the order of June 22, 1976, referred to, *infra*, and the power of EPA to enforce it by court action. *See Adamo Wrecking Co. v. United States*, 434 U.S. 275, 282, 98 S.Ct. 566, 571, 54 L.Ed.2d 538 (1978).

shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notification, the Administrator may issue an order requiring such person to comply with the requirements of such plan or he may bring a civil action in accordance with subsection (b) of this section.

The relief sought by EPA was an injunction ordering the Ohio Department of Highway Safety and its director (collectively "the State" or "the State of Ohio") to comply with the June 22nd order.[3]

After considering submissions of the parties and of amici curiae, the district court granted the State's motion to dismiss. In an unpublished memorandum the district court found that section 113(a)(1) does not provide an enforcement mechanism against a state which fails to comply with the requirements of an implementation plan.

The district court reached its conclusion by considering section 113(a)(2) along with section 113(a)(1). The court determined that the statutory scheme permits an action pursuant to section 113(a)(1) against individual violators of the requirements of a plan but not against a state for failing to enforce the plan. On the other hand, the court found that section 113(a)(2) is the proper vehicle when failure of a state to enforce a plan results in widespread violations. Section 113(a)(2) provides:

(2) Whenever, on the basis of information available to him, the Administrator finds that violations of an applicable implementation plan are so widespread that such violations appear to result from a failure of the State in which the plan applies to enforce the plan effectively, he shall so notify the State. If the Administrator finds such failure extends beyond the 30th day after such notice, he shall give public notice of such finding. During the period beginning with such public

notice and ending when such State satisfies the Administrator that it will enforce such plan (hereafter referred to in this section as "period of federally assumed enforcement"), the Administrator may enforce any requirement of such plan with respect to any person—

(A) by issuing an order to comply with such requirement, or

(B) by bringing a civil action under subsection (b) of this section.

The district court summarized its holding as follows:

I am convinced that if the Administrator is confronted with a non–enforcing state, his procedure under this statute is governed by subsection (a)(2) of § 1857c–8 [§ 113], which specifically concerns a case where violations are so widespread that they appear to result from the state's non–enforcement. I do not believe that the Administrator can avoid proceeding under subsection (a)(2) by including specific state enforcement avenues in his § 1857c–5(c) [§ 110(c)] promulgations and then issuing orders against the state under subsection (a)(1).

## II.

### A.

EPA contends that highways are treated the same under the Act as state–owned automobiles or power plants. That is, highways are themselves sources of pollution. Thus it argues that the only thing involved in this case "is the State's duty, as owner and operator of its highways, to comply with a valid federal regulation prohibiting registration of automobiles which have not complied with the emission inspection program." Since the State is a "person" within the meaning of the Act,[4] EPA argues that a state which fails to perform a duty imposed upon it by an implementation plan is a person in violation of such plan within the meaning of § 113(a)(1). According to

---

**3.** Section 113(b) permits an action for an injunction, or to assess a penalty of not more than $25,000 per day of violation, against violators of state implementation plans.

**4.** Section 302(e) of the Act, 42 U.S.C. § 7602(e) provides: "the term 'person' includes an individual corporation, partnership, association, state, municipality . . .," when used in the Act.

EPA, the district court misunderstood the different roles which section 113(a)(1) and section 113(a)(2) play in the enforcement of implementation plans. EPA argues that section 113(a)(1) is designed for enforcement against individual polluters including the state itself. Section 113(a)(2) offers the alternative of a "period of federally assumed enforcement" where the state has permitted widespread violations by its failure to enforce a plan. The fundamental error of the district court, according to EPA, was its failure to realize "that this regulation [the registration ban contained in 42 C.F.R. § 52.1878(e)] does not invoke the power of the Administrator to force a state to regulate others but rather invokes the power of the Administrator to regulate the State itself."

EPA supports its arguments with references to the legislative history, particularly that pertaining to the 1977 amendments. It maintains that vehicle inspection and maintenance programs are an integral part of the Act which Congress has found to be feasible and productive in the reduction of emissions. EPA points out that vehicle registration has long been used by the State as a means of regulating use of public highways as well as raising revenue for their construction and maintenance. Thus, the purpose of the registration ban is to require the State to modify the management of a facility which contributes to pollution. Rather than imposing some far–reaching new or expensive program on the State, contends EPA, the regulation merely requires it to change the manner in which it uses a "proprietary management tool."

### B.

The State of Ohio views the matter in a sharply different light. In the first place, the State denies it is an "operator" of highways. It is the builder and owner of the roads, but the only "operation" consists of individuals driving vehicles over them. Thus, any pollution which arises from the State's ownership of the roads is that caused by drivers, and EPA's enforcement efforts should be directed to the pollution–causing act. The State concedes that it could be sued under section 113(a)(1) if it operated vehicles which violated the emission limitations. This is quite different, however, from merely owning highways which attract vehicles whose emissions create air pollution, it contends. Thus, the State argues that section 113(a)(1) is designed to require compliance by persons whose activities cause the pollution, not as a mechanism for requiring the states to enforce an EPA plan. The term "any person" as used in section 113(a)(1) refers to active polluters, not to the mere owners of facilities which at most indirectly cause pollution.

As the State views the statutory scheme, Congress has given the states the first opportunity to enforce implementation plans. If the default of a state consists of failure to enforce a plan, there is no authority for direct action against the state under section 113(a)(1). Rather, in this situation, EPA is authorized to enforce the requirements of the plan directly against violators during a "period of federally assumed enforcement." 42 U.S.C. § 7413(a)(2).

The State contends that nothing in the Act indicates a Congressional intent to treat the states as violators of implementation plans by reason of their ownership of highways. It disputes EPA's argument that the legislative history, consisting primarily of post–1970 remarks of individual members of Congress, supports its theory. The State maintains that the Act is obviously structured in contemplation of cooperation between state and federal authorities. When this cooperation breaks down, for any reason, EPA is authorized to enforce a plan directly pursuant to section 113(a)(2). However, this is done by displacing the state as enforcer, not by requiring the state to enforce provisions of a plan which were devised by EPA. The State of Ohio asserts that if Congress had intended to authorize direct actions against the states, a departure from traditional state–federal relations, it would have made its intention clear and would not have moved into this sensitive area by indirection.

The State also argues that if the Act should be construed in accordance with EPA's contentions it must be held unconstitutional. The State cites Article IV, Section 4 of the Constitution and the Fifth and Tenth Amendments, and places particular reliance on *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

### III.

The precise issue in this case—whether EPA may proceed directly against a state to require enforcement of an EPA–promulgated provision of an implementation plan—appears not to have been treated by any court, at least in its present setting.[5] However, EPA regulations prescribing vehicle inspection and maintenance programs have been the subject of petitions for review by a number of states. The results have not been uniform. In *Brown v. EPA,* 521 F.2d 827 (9th Cir. 1975) (*Brown I*), the court held that the Act does not authorize sanctions against a state or its officials for failure to regulate pollution–creating activities of others than itself. "Tersely put, the Act, as we see it, permits sanctions against a state that pollutes the air, but not against a state that chooses not to govern polluters as the Administrator directs." *Id.* at 832. EPA did not contend in *Brown I* that the State of California was a polluter by reason of its ownership of highways. It merely sought to treat the State as a violator for its failure to enforce an implementation plan.

In *District of Columbia v. Train,* 521 F.2d 971 (D.C.Cir.1975), the District of Columbia, the State of Maryland, the Commonwealth of Virginia and several political subdivisions in the metropolitan Washington area sought review of a regulation establishing a vehicle inspection and maintenance program. After a thorough analysis of the Act, the court concluded that authority to require the states to deny registration to non–complying vehicles had been neither expressly granted nor withheld by Congress.

As discussed above, the specific language of the Act suggests that Congress did not confer such authority any more than it intended that the states would be ordered to adopt statutes. On the other hand, nowhere in the Act is the Administrator specifically told that he lacks authority to force the states to administer the plans he has promulgated when the plan is directed to a traditional state function such as registering and licensing motor vehicles. At least in the case of inspection and maintenance programs, it is apparent from the legislative history that Congress did intend that the states would be required to cooperate in administering a federal air quality program. 521 F.2d at 987. Noting the broad authority granted to the Administrator in the formulation of implementation plans, and giving due deference to that official's interpretation of the Act, *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), the court upheld the inspection and maintenance regulations, including the registration ban.

A similar determination was made in *Commonwealth of Pennsylvania v. EPA,* 500 F.2d 246 (3d Cir. 1974). The court's conclusion that EPA is authorized to require a state to enforce EPA's transportation control plan was buttressed by the "great deference" required to be given the agency's interpretation that direct federal enforcement was not the means contemplated by the Act. *Id.* at 257. On the other hand, on petition for review, a set of regulations which directed the State of Maryland to adopt binding regulations and enact legislation to include vehicle inspection and maintenance requirements was held invalid in *State of Maryland v. EPA,* 530 F.2d 215 (4th Cir. 1975).

The judgments of the courts of appeals in the cases from California (*Brown I*), the

---

5. *Friends of the Earth v. Carey,* 552 F.2d 25 (2d Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977), is distinguishable in several respects. It was a citizen suit rather than an action by EPA. Moreover, the provisions in question had been formulated by the State and City of New York, not by EPA.

District of Columbia and the State of Maryland were vacated by the Supreme Court in *EPA v. Brown*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977). The action of the Supreme Court was based on EPA's determination not to seek review of the invalidation of certain regulations and its concession that the remaining ones were invalid unless modified. Thus, the Supreme Court did not reach the question now before this court.

In *Brown v. EPA*, 566 F.2d 665 (9th Cir. 1977) (*Brown II*), the court consolidated a new petition by the State of California to review revised regulations with the case remanded by the Supreme Court. In *Brown II* the Court adhered to its previous decision that neither section 113(a)(1) nor section 113(a)(2) of the Act authorized sanctions against the State or its officials for failing to comply with transportation control regulations. In support of its revised regulations EPA made the argument upon which it relies in the present case--that the State is itself a polluter by reason of its ownership of streets and highways and that it can be required under section 113(a)(1) to comply with measures designed to reduce pollution caused by emissions from vehicles owned by others and operated on such public ways.

The court in *Brown II* noted that the Clean Air Act contained no mention of "indirect sources" of pollution prior to the 1977 amendments. The 1977 amendments provided for "indirect source review programs" at the election of the states, but denied EPA the right to require such programs.[6] The court reasoned that the "limited" authority granted the Administrator to promulgate indirect source review programs was inconsistent with the "expensive indirect source concept" urged by EPA. 566 F.2d at 671. However, *Brown II* was also a review of EPA regulations and the court was not required to determine whether section 113 empowers EPA to proceed directly against a state for failure to comply with a provision of a plan.

6. 42 U.S.C. § 7410(a)(5) (1976 ed., Supp. I).

## IV.

### A.

We look first to the language of the Act itself, particularly section 110 (42 U.S.C. § 7410) which deals with state implementation plans. Each state is required to adopt a plan for implementation, maintenance and enforcement of the national primary ambient air quality standard in each air quality control region of the state within nine months after promulgation of the national standard by EPA. 42 U.S.C. § 7410(a)(1). The administrator of EPA is required either to approve or disapprove each plan, or any portion thereof, within four months after the date required for submission. 42 U.S.C. § 7410(a)(2). In order to be approved each state implementation plan must provide, *inter alia*, "to the extent necessary and practicable, for periodic inspection and testing of motor vehicles to enforce compliance with applicable emission standards . . . ." 42 U.S.C. § 7410(a)(2)(G). EPA construes this provision as a more particular statement of the general requirement that each plan include emission limitations and other measures necessary for attaining and maintaining the primary air quality standard, including "transportation controls." 42 U.S.C. § 7410(a)(2)(B).

EPA is authorized to disapprove a state implementation plan if it is determined that the plan fails to provide for vehicle inspection "to the extent necessary and practicable." Further, EPA is authorized to promulgate a state implementation plan, or portion thereof, upon finding that one adopted by a state is deficient. 42 U.S.C. § 7410(c)(1)(B). However, we find nothing in the language of section 110 which indicates a Congressional intent either to permit EPA to require a state to enforce a portion of an implementation plan promulgated by EPA or to treat a state as a polluter by reason of its ownership of streets and highways.

1202

## B.

We next look to the language of section 113, which was added to the Act as part of the 1970 amendments. Pub.L. 91–604, § 4(a), 84 Stat. 1686. This section is captioned "Federal Enforcement." Laws of 91st Cong.2d Sess., [1970] 1 U.S.Code Cong. & Adm.News at 1954, 1966. Read in its entirety this section appears to deal with direct enforcement by EPA. Section 113(a)(1) requires that notice of a finding of a violation be given to "the person in violation of the plan and the State in which the plan applies . . . ." If the violation continues for 30 days, EPA may issue an order or bring a civil action against the violator. The logical interpretation of these provisions is that the notice to the state is designed to give the state an opportunity to bring about an abatement of a violation. If this is not accomplished within 30 days, EPA is authorized to act directly against the violator. Section 113(a)(2) provides identical remedies to EPA when widespread violations have occurred as a result of failure of the state to enforce the plan effectively. Other than including states within the meaning of "any person" there is no explicit authorization in the Act for EPA to bring a direct action against a state under section 113(a)(1).

## C.

EPA argues that the legislative history makes it clear that Congress intended to provide for direct action against states under section 113(a)(1). Section 113 was added to the Act as part of the Clean Air Amendments of 1970. There is little contemporaneous legislative history concerning this section. However, when Congress was considering the 1977 amendments to the Act, there were several references in reports and debate to section 113.

In reporting on a committee proposal, the Committee on Interstate and Foreign Commerce made the following statement:

This section envisions that the States will undertake to adopt and enforce the inspection and maintenance program.[24] In the event a State to which this section applies fails or refuses to adopt such an I/M system in its plan,[25] then the Administrator would be required to promulgate such a program for the appropriate region(s) in that State under section 110(c) of the Act.

[24] This does not mean that the I/M system must be State–owned and operated. It may be State licensed, but operated by private service stations or by a turnkey contractor. It may be operated in conjunction with, or separate from, safety inspection and maintenance programs and facilities, although the Committee encourages coordination of safety and emission I/M programs. These are decisions which the State is permitted to make if it adopts and enforces such an I/M program under this section.

[25] The State may, of course, adopt more stringent standards and/or test procedures under section 116 of the Act and these would be approvable by the Administrator.

Once the I/M program has become part of an "applicable implementation plan" (whether by State adoption and EPA approval or by promulgation of the Administrator), then enforcement and implementation can occur in several possible ways. Most preferably, the State may agree voluntarily to implement and enforce the I/M program. Other options include (1) inducing the State to do so, by offering grants under section 210 of the Act or by withholding part of a State program grant under section 105 of the Act or by such other means as have been held permissible by the Court in *District of Columbia v. Train*; (2) delegating authority to general purpose local governments to implement and enforce the program under section 303 of the bill; (3) if feasible, providing for Federal implementation and enforcement of the program (including Federal licensing of private I/M centers, or turnkey operations, and imposing Federal inspection fees); or (4) seeking injunctive relief under section 113 of the Act; or (5) a combination of the above. It should be noted that the various mechanisms for obtaining voluntary compliance (*e. g.*, withholding of program grants) are intended to provide alternatives to enforcement actions under section 113, thus allowing the Administrator to avoid compulsion where imple-

mentation of the necessary actions can be assured by other means.

In addition, in accordance with the decision of the Court in *District of Columbia v. Train*, the Committee has concluded that effective enforcement of this section requires a prohibition on the State registration (including licensing) of any non-complying motor vehicle.[26] The Committee agreed with that Court that such a measure would be constitutionally valid.

[26] Such a prohibition is to be included in each "applicable implementation plan" to which this section applies and may be enforced under section 113 of the Act against the State. The regulations, however, should permit operation of noncomplying vehicles for a reasonable temporary period to permit appropriate repair or adjustment.

H.Rep.No.95–294, reprinted in [1977] 2 U.S. Code & Cong.Adm.News at 1077, 1369–70.

In discussing the Senate version of the 1977 amendments Senator Muskie, one of the principal authors of the 1970 amendments, made the following statement:

In view of the time that has elapsed since enactment of the 1970 amendments, it is regrettable that legal uncertainties have held up implementation of inspection and maintenance programs and other necessary measures. EPA's authority to promulgate transportation control measures requiring the States to take action, where necessary, and to compel compliance with such requirements, where necessary, is clear in sections 110 and 113 of existing law. Although this is a delicate area of Federal–State relations, it is appropriate to require affirmative State action in the field of transportation controls where this proves necessary to protect the public health.

By providing roads and highways that facilitate and encourage extensive use of motor vehicles, the States have played a substantial, if unintentional role in causing the pollution problems that result. And, as a practical matter, State and local governments are in a better position than EPA to attack those problems, which involve millions of motor vehicles, through inspection and maintenance programs and similar measures.

In addition, the scheme contemplated by the act is a reasonable approach to this problem, one that is designed to involve the least possible intrusion into State affairs consistent with the task that is necessary. The 1970 amendments were carefully drawn to provide the States with maximum flexibility and discretion in developing plans under section 110 of the act, so long as the essential objective–attainment and maintenance of the national ambient air quality standards–was met. Thus, the States may make the basic policy choices, if they wish in developing inspection and maintenance programs and similar measures: Federal promulgation is required only if the States default.

For all these reasons, I hope that further progress in this area will not be stalemated by legal uncertainties, and I urge EPA to continue to press for implementation of of the necessary programs.

It should be noted that the various mechanisms provided to induce voluntary State implementation of approved or promulgated measures, such as cut–offs of highway funds for failure to implement such measures, are intended to provide alternatives to injunctive actions under section 113, thus allowing the Administrator to avoid compulsion where he believes that implementation can be assured by other means.

Cong.Rec. S9168 (June 8, 1977).

It should be noted that references both in the report and statement were to section 113, without distinguishing between 113(a)(1) and 113(a)(2). The regulation which makes a violator subject to an enforcement action is equally imprecise. It provides that failure to comply with "any approved regulatory provision of a state implementation plan" renders the person or governmental entity so failing "subject to enforcement action under section 113 of the Clean Air Act." 40 C.F.R. § 52.23 (1976). However, a reasonable meaning of these comments is that both procedures set forth in section 113 are available when violations of an implementation plan result from fail-

ure of a state to carry out a duty imposed upon it by a plan. There is no indication in the legislative history that EPA is limited to proceeding under section 113(a)(2) in every situation where a state is an offending party.

### D.

■ The district court was faced with a difficult problem of statutory construction and properly sought an interpretation which would not require a decision on the constitutionality of the Act. However, when section 113 is examined in its entirety it is not clear that (a)(1) and (a)(2) prescribe different means of enforcement under different sets of circumstances as contended by the State. They may be read to provide alternative mechanisms for dealing with a state's failure to comply with the provisions of an implementation plan. Both subsections permit proceedings against "any person" in violation of "any requirement" of an implementation plan. 40 C.F.R. § 52.-1878(e) makes it a requirement of the Ohio plan that vehicles which do not comply with inspection and maintenance standards be denied registration and the right to operate on the public streets and highways of Cincinnati and Hamilton County. By refusing to comply with this requirement the State of Ohio became a "person" in violation of a provision of the plan. To proceed under section 113(a)(2), in effect displacing the State as regulator of motor vehicles during a "period of federally assumed enforcement," would be a more drastic remedy than the one chosen by EPA in this case.

As the legislative history makes clear, EPA has at its disposal several mechanisms for obtaining voluntary compliance by a state. When these fail, and resort is had to section 113, we find nothing in the language of the Act which requires EPA to utilize (a)(2) rather than proceeding directly against the state, as it could against any other person in violation, pursuant to section 113(a)(1). Under these circumstances we are constrained to agree with the interpretation of the Act adopted by the Administrator and hold that EPA properly pro-

ceeded against the State under section 113(a)(1). Therefore, we conclude that the district court erred in its holding to the contrary.

We do not reach this conclusion on the basis of EPA's argument that the State is itself a polluter by reason of its ownership of streets and highways. We find nothing in the Act or legislative history to support this strained construction. Senator Muskie's reference to the "substantial, if unintentional, role" of the states in causing pollution does not support EPA's argument. Ownership and control of streets and highways, along with the historic practice of licensing vehicles, however, do combine to provide a completely rational basis for placing upon the State the obligation to prevent use of these facilities by noncomplying vehicles. When the State fails to perform that duty it becomes a person in violation of a requirement of the implementation plan. As a violator, the State is subject to the enforcement procedures of section 113(a)(1). We prefer this straightforward interpretation of the Act to the convoluted arguments of EPA.

### V.

Our holding above requires treatment of the constitutional arguments put forward by the State. The State of Ohio does not dispute the fact that air pollution is a national problem and that its control by Congress is within the authority granted by the Commerce Clause. The State maintains, however, that requiring it to enforce part of a plan promulgated by EPA represents an unconstitutional intrusion into its activities as a state.

In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held that the 1974 amendments to the Fair Labor Standards Act were unconstitutional in attempting to extend minimum wage and maximum hour provisions to employees of states and political subdivisions. The Court considered the costs which the states would incur if required to comply with the FLSA. Beyond that, however, the Court concluded

that the effect of the 1974 amendments would be to displace state decisions and policies and possibly require substantial restructuring of the traditional ways in which states have chosen to manage their affairs.

■ The critical question, as stated by the Supreme Court in *National League of Cities, supra*, 426 U.S. at 851, 96 S.Ct. at 2474, is whether the federal action "will impermissibly interfere with the integral governmental functions ..." of the state. It cannot be questioned that any injunctive action by the United States against a state puts stress on our federal system. Nevertheless, a scheme which seeks to enforce state cooperation in an effort to deal with a national problem will not fall under the proscription of the Tenth Amendment if it leaves the states free to make choices which are essential to their functions as states in the present action, EPA does not seek to revamp the Ohio system of vehicle licensing or, for that matter, of operating its streets and highways. The regulation which EPA seeks to enforce does not require the State to adopt legislation, establish new regulatory agencies or change its procedures for registering vehicles. It merely requires the State to deny use of state–owned facilities to those whose use adds to the national problem of pollution. Further it does not appear that compliance will entail large expenditures by the State.

■ In *National League of Cities*, the Court reaffirmed the vitality of its decision in *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975). In *Fry* the Supreme Court described the Tenth Amendment as follows:

> While the Tenth Amendment has been characterized as a "truism," stating merely that "all is retained which has not been surrendered," *United States v. Darby*, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability

to function effectively in a federal system.

421 U.S. at 547, n. 7, 95 S.Ct. at 1795 n. 7. We do not believe requiring Ohio to deny registration to non–complying vehicles will impair the integrity of the State or its ability to function in the federal system. The federal interest in controlling air pollution far outweighs any state interest in permitting non–complying vehicles to use public streets and highways. Justice Blackmun filed a concurring opinion in *National League of Cities* in which he wrote:

> In my view, the result with respect to the statute under challenge here is necessarily correct. I may misinterpret the Court's opinion, but it seems to me that it adopts a balancing approach, *and does not outlaw federal power in areas such as environmental protection, where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential.*

426 U.S. at 856, 96 S.Ct. at 2476 (emphasis added).

■ We conclude that the provision permitting EPA to enforce a regulation which requires the State to withhold registration from vehicles that do not comply with applicable pollution standards and procedures represents a lawful exercise by Congress of its power to regulate interstate commerce.

■ We have considered the State's contention that the proceedings under section 113(a)(1) violate Article IV, Section 4 of the Constitution (guarantee to each state of a republican form of government) and the Fifth Amendment, but find them to have no merit.

## VI.

■ In its cross–appeal the State makes two arguments. In the first place it contends that 40 C.F.R. § 52.1878(e) is ambiguous, and properly construed, should be read to impose duties on Cincinnati and Hamilton County, but not on the State. This argument is based on the fact that there is no "connective word" between the refer-

ence to the City and County and to the State. However, only the State requires registration of title, and it is clear that this requirement of the regulation refers to the State. The regulation could have been drawn more precisely, but we do not find it to be ambiguous. The State also contends that the regulation should be construed not to apply to it because it provides criminal penalties. This argument assumes an ambiguity which we have found not to exist.

■ The State makes the somewhat related argument that EPA's interpretation of the regulation is entitled to no special deference since the enforcement statute (section 113(c)) provides criminal penalties. In this action EPA did not seek criminal sanctions. It proceeded under section 113(b) which provides for an injunction or a civil penalty of $25,000 per day of violation, or both. The decision of the district court that 40 C.F.R. § 52.1878(e) applies to the State as well as to the City and County was made in an action in which EPA sought an injunction only against the State. The cross–appeal discloses no error on the part of the district court in construing or applying the regulation.

The judgment of the district court is reversed on direct appeal and affirmed on cross–appeal, and the cause is remanded for further proceedings.

WEICK, Circuit Judge, dissenting:

I respectfully dissent. As the majority concedes, we are treading on virgin territory. No court has ever enforced upon a state any order similar to the one involved here. I believe that District Judge Duncan arrived at the correct result and I would affirm his decision.

The Director of the State of Ohio Department of Highway Safety had no legal authority to withhold licenses to persons applying for them to operate their automobiles, in order to enforce regulations adopted by EPA which were claimed to have been violated not widespread in Ohio, but only in the Cincinnati, Hamilton County area. It would require legislation to be enacted by Ohio's legislature. The state

legislature had not enacted such enabling legislation and in its absence EPA cannot proceed against a state officer who had no authority to act nor could EPA order the state to enact the necessary legislation.

The argument of EPA that because Ohio owns title to the highways, it is a polluter and may be proceeded against both criminally and civilly. This argument borders on being frivolous. It is a non sequiter. If the state operated a truck on the public highways in violation of an EPA regulation or operated a plant or other facility in violation thereof, it could be proceeded against directly by EPA. By no stretch of the imagination, however, could the state be held liable civilly or criminally because of the violation by other persons of EPA regulations merely because the state legislature took no action enabling state officers to enforce federal laws or regulations. This position of EPA was rejected in *Brown v. EPA*, 566 F.2d 695 (9th Cir. 1977). To proceed against the state of Ohio under these circumstances not only deprives the state of due process of law but of the equal protection of the law as guaranteed by the Constitution of the United States. It would also violate the plainest principles of federalism. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245; *United States v. Best*, 573 F.2d 1095, 1103 (9th Cir. 1978). The state should no more be required to enforce federal laws than the federal government should be required to enforce state laws.

Ohio is a sovereign state and has sovereign immunity under the Eleventh Amendment to the Constitution. It may not be sued in Ohio's courts for damages by private individuals. *Kraus, Admr. v. State*, 31 Ohio St.2d 132, 285 N.E.2d 736 (1972). A suit against a state agency in Ohio is in substance and effect a suit against the state and may not be maintained. *Wolf v. Ohio State University Hospital*, 170 Ohio St. 49, 162 N.E.2d 475 (1959); *State ex rel. Williams v. Glander*, 148 Ohio St. 188, 74 N.E.2d 82 (1947).

EPA obviously must not be very confident of the merits of its case when it moved this court to dismiss its appeal as moot because Ohio had enacted legislation to implement its procedures but which in no way governs, controls or applies to the issues of this appeal. We ought to comply with EPA's request and dismiss its appeal not because the issues are moot but because its appeal lacks merit and asserts grave constitutional questions which should not be necessary for us to decide. *Cf. United States v. Washington,* 573 F.2d 1118 (9th Cir. 1978).

Other concessions made by EPA of the invalidity of its own regulations were detailed by the Supreme Court in *EPA v. Brown,* 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977). These regulations were held invalid in *Brown v. EPA,* 521 F.2d 827 (9th Cir. 1975); *Arizona v. EPA,* 521 F.2d 825 (9th Cir. 1975); *District of Columbia v. Train,* 521 F.2d 971 (1975); *Maryland v. EPA,* 530 F.2d 215 (4th Cir. 1975). Because of these concessions the Supreme Court remanded all four cases for consideration of mootness and other questions. On remand, EPA made a further concession that the statute does not permit it to compel state enforcement. *Brown v. EPA,* 566 F.2d 665, 659 n. 2 (9th Cir. 1977); *District of Columbia v. Costle,* 567 F.2d 1091 (D.C.Cir.1977) remanded for further administrative proceedings.

The conduct of EPA in coercing states to enforce its regulations by withholding federal funds to which the states were entitled for other purposes has been condemned. See article in Wall Street Journal entitled "Exhausting States' Rights", August 5, 1980.