**SAN ANTONIO METROPOLITAN TRANSIT AUTHORITY, Plaintiff,**

and

**American Public Transit Association, Plaintiff-Intervenor,**

v.

**The Honorable Raymond J. DONOVAN, Secretary of Labor of the United States, Defendant,**

and

**Joe G. Garcia, Defendant-Intervenor.**

**Civ. A. No. SA–79–CA–457.**

United States District Court, W.D. Texas, San Antonio Division.

Feb. 18, 1983.

Washington, D.C., Hubert W. Green of Green & Kaufman, Inc., San Antonio, Tex., for American Public Transit Ass'n.

Dennis Linder, Mark Rutzick of Dept. of Justice, Washington, D.C., Edward C. Prado, U.S. Atty., San Antonio, Tex., for Honorable Raymond J. Donovan, Secretary of Labor.

Linda R. Hirshman, Kalman D. Resnick of Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., Les Mendelsohn of Branton & Mendelsohn, Inc., San Antonio, Tex., for Joe G. Garcia.

## MEMORANDUM OPINION

SHANNON, District Judge.

At issue in this case is whether operation of a local transit authority by the San Antonio Metropolitan Transit Authority (SAMTA), a political subdivision of the State of Texas, is a "traditional" governmental function entitled to the Tenth Amendment immunity recognized in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

On November 17, 1981, this Court granted Summary Judgment for SAMTA, finding that it performed a traditional state function that met all the requirements for Tenth Amendment immunity from the minimum wage and overtime pay provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* A direct appeal to the Supreme Court pursuant to 28 U.S.C. § 1252 followed. The Supreme Court remanded the case for reconsideration in light of its intervening holding in *United Transportation Union v. Long Island Railroad Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (hereinafter *LIRR* ). 457 U.S. ——, 102 S.Ct. 2897, 73 L.Ed.2d 1309 (1982).

Upon further consideration, this Court finds nothing in *LIRR* that compels a change in its previous conclusion that operation of a public transit system is a governmental function entitled to Tenth Amendment immunity. When the factors considered by the Supreme Court in *LIRR* are applied to public transit, they indicate that

George P. Parker, Jr., Charles J. Fitzpatrick, Lewis T. Tarver of Matthews & Branscomb, San Antonio, Tex., for San Antonio Metropolitan Transit Authority.

William T. Coleman, Jr., Donald T. Bliss, Zoe E. Baird of O'Melveny & Meyers,

it is once again appropriate to grant Summary Judgment for the Plaintiff and Plaintiff-Intervenor.

In *Usery,* the Supreme Court cut short the long reach of Congress' Commerce Clause power when it held that the Tenth Amendment prohibits the use of Commerce Clause power "to force directly upon the States its (Congress') choices as to how essential decisions regarding the conduct of integral governmental functions are to be made." 426 U.S. at 855, 96 S.Ct. at 2476. The distinguishing characteristic entitling a state function to Tenth Amendment protection from federal regulations has been described variously as "integral", "essential", "basic", and "traditional". Despite the abundance of adjectives, identifying which particular state functions are immune remains difficult. Until *LIRR* the Supreme Court had not supplied guidelines for the application of its constitutional rule. Even after *LIRR,* the Court's own efforts at identifying a sovereign state function have been marked by disagreement. *See, Federal Energy Regulatory Commission v. Mississippi,* —— U.S. ——, 102 S.Ct. 2126, 2141 n. 30, 72 L.Ed.2d 532 (1982).

Like *LIRR,* this case deals with the third part of the analysis used in *Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981): whether the states' compliance with federal law directly impairs their ability to structure integral operations in areas of traditional functions. *Usery* has already decided that structuring wages is an integral operation. The only question is, therefore, whether public transit is one of "the *numerous* line and support activities which are well within the area of traditional operations of state and local governments." *Usery,* 426 U.S. at 851 n. 16, 96 S.Ct. at 2474 n. 16 (emphasis added)

■ *LIRR* indicates at least three factors must be considered. First, historical reality is important. A long record of state activity in an area is one indication that a function is one of the essential types of activities that states have the primary responsibility for performing and must be free to perform if they are to meet their responsibilities to their citizens.

The focus on historical reality was not, however, intended "to impose a static historical view of state functions". 102 S.Ct. at 1354. Therefore, any other factors that, like historical reality, indicate that a function is presently a basic state prerogative, interference with which would impede the states' ability to fulfill their role in the federalist system, should also be considered. Analogy to the non-exclusive list of traditional functions set out in *Usery* and analysis under the four-part test developed in *Amersbach v. City of Cleveland,* 598 F.2d 1033, 1037 (6th Cir.1979) are both useful for this purpose.

Finally, in the special case of recent conversion of a private sector function to public ownership and operation, the history and scope of federal regulation must be considered to determine whether the conversion has the prohibited effect of eroding longstanding federal authority.

I.  Historical Reality

Overseeing, maintaining, and regulating local and regional transportation systems historically has been a state responsibility. *Peel v. Florida Department of Transportation,* 600 F.2d 1070, 1083 (5th Cir.1979). These functions are matters of a "peculiarly local nature", and the states' exercise of their prerogatives in this field has been given great deference. *Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 523–24, 79 S.Ct. 962, 964–965, 3 L.Ed.2d 1003 (1959) (State highway regulations carry a strong presumption of validity.) *See also, Molina-Estrada v. Puerto Rico Highway Authority,* 680 F.2d 841, 845–46 (1st Cir.1982) (State agency that oversees roads and plans to build a mass transit system performs governmental activities traditional "from time immemorial".); *Amersbach,* 598 F.2d at 1037 ("Airports are indispensable" to "a principal mode of passenger transportation" and are therefore "traditional-integral governmental functions."); *United States v. Best,* 573 F.2d 1095, 1102–03 (9th Cir.1978) (Licensing of drivers is an integral state

function.); *United States v. State Road Department of Florida,* 255 F.2d 516, 518 (5th Cir.1958) (Building and maintenance of a system of state roads is essentially a governmental function.)

Mass transit is an integral component of a state's transportation system. It has been treated as such from the time of the earliest transportation regulation in Texas up until the present day.[1]

The historical reality of mass transit reveals a long record of state concern and activity in the field. The historical record *is not* one of predominately public ownership and operation of transit services.[2] *Kramer v. New Castle Area Transit Authority,* 677 F.2d 308, 309 (3rd Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983). Instead of owning and operating these services, states chose to manifest their interest through regulation of fares, routes, schedules, franchising, and safety. For example, a 1913 Texas statute gave cities the authority to regulate fares and operations of vehicles used to provide carriage for hire. *See,* fn. 1, *supra.* A 1915 City of San Antonio ordinance established franchising, insurance, and safety requirements for all passenger vehicles operated for hire. Ordinance OF1–1 (March 8, 1915). The City continued regulation through ordinances up until 1959, when the first steps in the transformation of the system from private to public hands were taken.

This record of state regulatory activity indicates that mass transit has traditionally been a state prerogative and responsibility, not a federal concern. That states chose to leave ownership and operation in private hands and to effect their interest through regulation does not negate the inference of sovereignty that arises from history. *Usery* sought to guarantee states the freedom to select the most suitable means to accomplish their goals in areas of unique and special concern to them. States would be victims of a strange irony if they are to be told that they are free to make their own decisions, but that they made the wrong choice and, therefore, decisions that otherwise meet the requirements for Tenth Amendment immunity[3] will be displaced by federal regulations.

## II. Recent Conversion and Prior Federal Regulation

■ Notwithstanding indications of Tenth Amendment immunity arising from a review of history, *LIRR* precludes Tenth Amendment immunity when it would erode federal authority over previously private functions recently converted to public ownership. 102 S.Ct. at 1355. The recent history of both mass transit in general and of SAMTA in particular[4] includes such a con-

---

1. A 1913 state statute delegated to cities exclusive control over their streets and highways, including the power to regulate, license and fix fares for vehicles used to provide carriage for hire. 1913 Tex.Gen.Law, ch. 147, § 4, at 314, *as codified,* Tex.Rev.Civ.Stat.Ann. art. 1175, §§ 20, 21 (Vernon 1963). A 1975 statute establishing a system of state funding for mass transit contained a policy declaration that "public transportation is an essential component of the state's transportation system." Tex.Rev.Civ. Stat.Ann. art. 6663c, § 1(a)(2) (Vernon 1977).

2. Public ownership and operation was not, however, unusual or unique. Some of the larger metropolitan areas in the country had publicly owned and operated systems as early as the beginning of this century. *Kramer,* 677 F.2d at 309.

3. While the states' decision to regulate rather than own and operate a function should not control the determination of whether a function is one traditionally associated with the states, the decision may deprive the states of Tenth Amendment immunity for other reasons. *See, Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 2364–69, 69 L.Ed.2d 1 (1981) where federal regulation of strip mining was found not to infringe on Tenth Amendment guarantees because the regulation did not regulate states as states, which is one of the requirements for Tenth Amendment immunity.

4. Bus service in San Antonio was provided by a private company until 1959, when the city purchased the private system. The San Antonio Transit System, as it was called, was operated pursuant to the terms of a private revenue bondholders' indenture with a local bank. In 1978, the system's facilities and equipment were transferred to SAMTA, doing business under the name VIA Metropolitan Transit. SAMTA is a political subdivision of the State of Texas, created pursuant to Article 1118x of Vernon's Annotated Texas Statutes. It came

version. *Kramer,* 677 F.2d 309. Unlike the railroad in *LIRR,* however, neither labor relations nor other aspects of mass transit have been the subject of federal regulation that will be eroded by recognizing a Tenth Amendment immunity.

In *LIRR,* the federal statute under attack was the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.* The Court found the act to be the most recent in a long history of federal railway labor relations statutes going back to 1888. 102 S.Ct. at 1355.

In this case, the federal statute under attack is the FLSA. Unlike the RLA, the FLSA is not a current manifestation of a traditional federal concern for labor relations in the mass transit field. Transit was specifically exempted from coverage from the time of the Act's original passage in 1938 until 1961 amendments subjected private transit operators to minimum wage provisions (but not the overtime pay provisions). Pub.L. No. 75–718, § 13(a)(9), 52 Stat. 1067 (1938); Pub.L. No. 87–30 §§ 2(c), 9, 75 Stat. 65, 66, 72 (1961). Public employers remained entirely exempt until 1966. Diminution of federal authority resulting from private to public conversions during this period would have been attributable to the statutory exemption and consistent with congressional intent.

The FLSA was amended again in 1966 and 1974, eventually subjecting public transit employers to the full range of the Act's wage and overtime pay provisions.[5] It is the combined effect of these amendments that is at issue in this case. Because of

their recent vintage alone, they cannot be the basis for finding a long standing federal regulatory scheme that will be eroded by a grant of Tenth Amendment immunity. *But cf, Scholz v. City of LaCrosse,* No. 80–C–238, slip op. (W.D.Wis., September 1, 1982) (FLSA is the traditional federal regulation that precludes Tenth Amendment immunity for all public transit.)

The National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* is another source of federal authority. It is a generally applicable federal statute that has governed labor relations for private transit companies since its enactment in 1935. The NLRA, like the FLSA prior to 1966, contains an exemption for state and local governments. Thus, any diminution of federal authority under the NLRA that results from a private to public conversion is attributable to this statutory exemption, not to the Tenth Amendment, and is consistent with congressional intent.

Similarly, the Urban Mass Transportation Act (UMTA), 49 U.S.C. § 1601 *et seq.* will not be eroded by Tenth Amendment immunity. UMTA is an exercise of the Spending Power, implementing federal interests by conditioning federal funding on *voluntary* compliance by states. *See,* discussion at III, A, *infra.* UMTA's labor relations provision, section 13(c), was not intended to impose federal regulation or displace state prerogatives in the field of transit labor relations. *Jackson Transit Authority v. Local Div. 1285, Amalgamated Transit Union,* ——

---

into existence in 1977 by virtue of actions taken by the City Council of San Antonio, which were confirmed in a general election held in November, 1977. That same election authorized SAMTA to collect a one-half percent (½%) sales tax. See Affidavit of Wayne M. Cook, paragraph 2 (filed April 30, 1980); Defendant-Intervenor Garcia's Memorandum in Response to Remand (filed November 15, 1982).

5. The 1966 amendments extended the FLSA to states and their political subdivisions with respect to schools, hospitals, and "street, urban or interurban electric railway(s), or local trolley or motorbus carrier(s) ... whose rates and services are subject to regulation by a State or local agency." Pub.L. No. 89–601, § 102, 80 Stat. 831 (1966). These amendments specifi-

cally exempted operators, drivers and conductors of such railways and carriers from the overtime provisions of the Act. *Id.* at § 206, 80 Stat. at 836. The constitutionality of these amendments was upheld with respect to schools and hospitals in *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). The same provisions were later invalidated in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

The 1974 amendments eliminated completely the public employer exemption of the 1938 act and also repealed the overtime exemption for operational employees of transit services. Pub.L. No. 93–259, §§ 6, 21(b)(1), 88 Stat. 58, 68 (1974).

U.S. ——, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982). Regardless of whether or not Tenth Amendment immunity is granted, states will still have to comply with federal standards if they want to continue receiving federal money.

The effect of federal anti-discrimination statutes will not be eroded by granting transit a Tenth Amendment immunity. *See, Pearce v. Wichita County,* 590 F.2d 128, 132 (5th Cir.1979) (ability to discriminate is not a function essential to the separate and independent existence of the states). The Veterans' Reemployment Rights Act, 38 U.S.C. § 2021 *et seq.* will not be eroded by granting transit Tenth Amendment immunity. *Peel,* 600 F.2d 1070.

Nor will the effect of several federal statutes affecting aspects of mass transit other than labor relations be eroded. Defendant cites the Occupational Safety and Health Act, the Employees Retirement Income Security Act and antitrust laws. Post-Hearing Memorandum on Federal Regulations of Transit (filed January 21, 1983). But, each of these statutes has either a statutory or judicial exemption for public employers that is the limitation on federal authority rather than the Tenth Amendment. 29 U.S.C. §§ 652(5), 1003(b)(1); *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). The Clean Air Act will continue to apply. *Friends of the Earth v. Carey,* 552 F.2d 25 (2nd Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). The federal income tax laws will continue to apply, and public transit employees, like firemen, police officers, nurses and even elected public officials will have to pay their federal income taxes.

Defendant and Defendant-Intervenor have not shown that the effectiveness of any federal statute other than the FLSA, the constitutionality of which is at issue, will be eroded by granting transit Tenth Amendment immunity. In the absence of any erosion of federal authority, nothing in *LIRR* precludes Tenth Amendment immunity for previously private functions con-verted to public ownership and operation. To the contrary, the rule announced in *LIRR* implicitly recognizes that some conversions—those that do not erode federal authority—will result in Tenth Amendment immunity. Many governmental functions of today have at some time in the past been private functions. To deny Tenth Amendment immunity on the ground that in the past the private sector was heavily involved in providing transit services would impose precisely the "static historical view of state functions" that *LIRR* eschews. 102 S.Ct. at 1354.

### III. Other Factors Indicating Danger to the States' Separate And Independent Existence

*LIRR* tells courts that tradition is an important consideration because it can reveal whether a government function is so intimately connected with the states that "federal regulation ... would be likely to hamper the state government's ability to fulfill its role in the Union and endanger its 'separate and independent existence.'" 102 S.Ct. at 1355 (citation omitted). With that as the goal of a Tenth Amendment inquiry, a court should go beyond historical analysis and consider other factors that indicate a function is so closely associated with states that Tenth Amendment immunity is required.

### A. Analogy

Analogy to the non-exclusive list of traditional state functions set out in *Usery* is one method of testing for Tenth Amendment immunity. *See, Fry v. United States,* 421 U.S. 542, 557–58, 95 S.Ct. 1792, 1800–1801, 44 L.Ed.2d 363 (1975) (Rehnquist, J., dissenting; proposes an analogy test); *Scholz,* slip op. at 5 (most productive analysis is by analogy to functions which have been found to be traditional).

*Usery* stated that fire prevention, police protection, sanitation, public health, and parks and recreation were among the "*numerous* line and support activities which are well within the area of traditional operations of state and local governments." 426

U.S. at 851 n. 16, 96 S.Ct. at 2474 n. 16 (emphasis added). By overruling *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), the Court added to this list public schools and hospitals. The only state function specifically taken off the list is state operation of a commuter railroad.[6] *LIRR,* 102 S.Ct. at 1349.

The states themselves have given public transportation almost universal recognition as an essential state function, thus placing it on a par with the *Usery* functions. *See,* Tex.Rev.Civ.Stat.Ann. art. 1118x, § 6(a) (Vernon 1982 Supp.)[7]

It is also evident from Congressional debate on public transportation legislation that Congress recognized the similarities between public transit and the *Usery* functions. *See, Metropolitan Mass Transportation Legislation: Hearings Before Subcomm. No. 1 of the House Comm. on Banking and Currency,* 86th Cong., 2d Sess. 14, 26 (1960) ("it is as necessary to provide transportation for these new communities as it is to provide other public necessities such as water, sewers, police and fire protection and so forth" [statement of Rep. Addonizio] . . . "it is a vital public necessity that such service be provided, as necessary to economic life of the community as the provision of water, police and fire protection and other recognized public necessities"

[statement of Rep. Corbett]); 120 Cong. Rec. 1042 (1974) ("mass transit is as much an essential public service as the fire department or hospitals" [statement of Sen. Biden]); 119 Cong.Rec. 4243 (1973) ("Mass transit is as much a public necessity as sanitation, police protection and education and can have the same overall community benefits." [statement of Sen. Hart]).

Moreover, it is extremely difficult to articulate an adequate basis upon which to distinguish public transit from the *Usery* functions. *Kramer v. New Castle Area Transit Authority,* 677 F.2d 308 (3rd Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983) is a case that presents precisely the question presented by this case. It distinguished public transit on the basis of the large amount of federal funding made available pursuant to UMTA and denied Tenth Amendment immunity to a public transit authority. The level of federal funding is an unsatisfactory distinction for three reasons.

First, UMTA is an exercise of the Congressional Spending Power granted in Article I, Section 8, Clause 1 of the Constitution. *Voluntary* cooperation by a state with federal regulations enacted as a condition for the receipt of federal funds does not have the same negative implications for state sovereignty as does the unavoidable

---

6. The Long Island Railroad and SAMTA perform identical functions, transporting commuter passengers to and from homes, work places, schools, and stores. If the railroad is not exempt, then, by analogy, the bus system should not be exempt. Under *LIRR,* however, bus systems must be distinguished from railroad lines on the basis of the absence of a history of federal regulation. See discussion at II, *supra.* For other distinctions between commuter railroads and commuter buses see the brief filed by the United States as an *amicus curiae* in *LIRR.* (attached as Exhibit A to SAMTA'S Reply to the Defendants' Memoranda on Remand (filed November 23, 1982)).

7. For other state laws decreeing public mass transit to be an essential function of government and showing that the concept embodied in Article 1118x is not unique to Texas, *see Inman Park Restoration, Inc. v. Urban Mass Transportation Administration,* 414 F.Supp. 99, 104 (N.D.Ga.1975), *aff'd,* 576 F.2d 573 (5th Cir. 1978) (quoting an amendment to the state con-

stitution providing that the public transportation of passengers for hire within a metropolitan area is an "essential governmental function"); *Henderson v. Metropolitan Atlanta Rapid Transit Authority,* 236 Ga. 849, 225 S.E.2d 424, 427 (Ga.1976) (quoting a Georgia statute providing that MARTA is performing "an essential governmental function"); *Mass Transit Administration v. Baltimore County Revenue Authority,* 267 Md. 687, 236 Ga. 849, 298 A.2d 413, 415 (Md.Ct.App.1973) (quoting a Maryland statute that the Metropolitan Transit Authority is "performing an essential governmental function"); *Teamsters Local Union No. 676 v. Port Authority Transit Corp.,* 108 N.J.Super. 502, 261 A.2d 713, 716 (N.J.Sup.1970) (same—New Jersey statute); *County of Niagara v. Levitt,* 97 Misc.2d 421, 411 N.Y.S.2d 810, 812 (Sup.N.Y.1978) (same—New York statute); *Pennsylvania v. Erie Metropolitan Transit Authority,* 444 Pa. 345, 281 A.2d 882, 885 (Pa. 1971) (same—Pennsylvania statute).

*imposition* of a federal scheme. Even the Court in *Usery* stopped short of finding that exercises of the Spending Power intruded on states' Tenth Amendment rights. 426 U.S. at 852 n. 17, 96 S.Ct. at 2474 n. 17. UMTA establishes a system of "cooperative federalism" that resembles a number of other statutes that lack Tenth Amendment implications. *Hodel,* 101 S.Ct. at 2366. If a state does not wish to receive federal transit funds, there can be no suggestion that the federal government is imposing a federal regulatory program that displaces state decisions. *See, United States v. Ohio Department of Highway Safety,* 635 F.2d 1195, 1205 (6th Cir.1980), *cert. denied* 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981) (federal scheme seeking to enforce state cooperation not a Tenth Amendment violation if state remains free to make essential decisions).

Second, federal funding supports each of the *Usery* functions.[8] At the time *Usery* was decided, the federal budget called for expenditures of $716 million for law enforcement. 426 U.S. at 878, 96 S.Ct. at 2486–2487 (Brennan, J., dissenting). During fiscal 1979, the Department of Education alone provided state and local governments with $5.995 billion for education. Special Analysis, Budget of the United States Government Fiscal Year 1981 (Office of Management and Budget), pp. 267–68, table H–11. During 1979, the federal government likewise made grants to state and local governments of $3.756 billion for sewage treatment plant construction, *id.* at 265; $14.377 billion for health, *id.* at 269; and $517 million for the administration of justice, *id.* at 270.

Transit survives on a mix of funding indistinguishable from that relied upon by many of the *Usery* functions. Transit, sanitation, hospitals, higher education and parks all combine operating revenues such as fares, user fees, tuition and admission fees with state and local tax revenues and federal subsidies. Institute of Public Administration, Financing Transit: Alternatives for Local Government, Table 10–2 at 228 (July 1979) (attached as Exhibit A to Brief for SAMTA in Opposition to Defendants' Motion to Strike and for Extension of Time (filed August 7, 1980); hereinafter Financing Transit); Affidavit of Wayne M. Cook, paragraph 6 (filed April 3, 1980).

Third, the recent dramatic shifts in federal priorities show that federal funding is a particularly inappropriate test for a state's Tenth Amendment immunity. Federal funding is responsive to changing political demands. Funding levels reveal what the federal government considers its interest to be at any one point in time, but they do not adequately measure a state's sovereign interest.

Importance of a function to a state's citizens is, like federal funding, an inadequate basis for distinguishing public transit from the *Usery* functions. Certainly, public transit is at least as important as parks and recreation and has as great a community-wide impact as hospitals.

Pervasiveness of government performance of a function is another inadequate distinction. It is true that not all cities and states provide public transit services. Defendant's Memorandum in Response to the Supreme Court Remand at 9–15 (filed November 3, 1982). But, in urban areas,

**8.** Some of the federal statutes authorizing financial support for state functions exempted in *Usery* are as follows:

*Police:* Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3701, *et seq.;* Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. § 5601, *et seq.*

*Fire:* Federal Fire Prevention and Control Act of 1974, 15 U.S.C. § 2201, *et seq.*

*Education:* Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701, *et seq.*

*Public Health/Hospitals:* Public Health Service Act, 42 U.S.C. § 201, *et seq.* (as amended

by the Health Planning and Resources Development Amendments of 1979); Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6001, *et seq.*

*Parks and Recreation:* Urban Park and Recreation Recovery Act of 1978, 16 U.S.C. § 2501, *et seq.;* Housing and Community Development Act of 1974, 42 U.S.C. § 5301, *et seq.*

*Sanitation:* Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq.;* Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. § 3301, *et seq.;* Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*

where mass transit is a necessary service, there is pervasive government performance. In 230 of the 279 urban areas identified by the Department of Transportation (DOT), government provides transit services. SAMTA'S Reply to the Defendants' Memoranda on Remand at 11 (filed November 23, 1982) (hereinafter SAMTA'S Reply). When mass transit service is provided, it is government that provides it over 90 percent of the time. *Kramer,* 677 F.2d at 309. This is a more pervasive government involvement than is present in hospitals, an exempt function under *Usery.* Only 177 of the 279 urbanized areas identified by DOT have hospitals operated by state or local government. SAMTA'S Reply at 12.

A function's origins in the private sector is another inadequate basis for distinguishing transit from the exempt *Usery* functions. *LIRR'S* admonition against imposing a static historical view of government functions means that private sector origins do not legally preclude Tenth Amendment immunity. Hospitals, for example, had private sector origins. *Id.* at 17. Even though the Supreme Court now considers hospitals to have been fully transformed into a traditional and sovereign state function, private sector involvement remains significant. The private sector provides approximately half the hospital services in the United States. *Id.;* SAMTA'S Memorandum in Response to the Remand at 12 n. 5 (filed July 15, 1982).

If transit is to be distinguished from the exempt *Usery* functions it will have to be by identifying a traditional state function in the same way pornography is sometimes identified: someone knows it when they see it, but they can't describe it.

### B. The *Amersbach* Test

Another method of testing for Tenth Amendment immunity is to evaluate the four factors set out in *Amersbach v. City of Cleveland, supra:* (1) does the function benefit the community as a whole and is it made available at little or no direct expense; (2) is the function undertaken for public service rather than pecuniary gain;

(3) is government particularly well suited to perform the function because of a community-wide need; and (4) is government the principal provider of the function? 598 F.2d at 1037. When applied to mass transit, these factors indicate that Tenth Amendment immunity is appropriate.

Public transit benefits the community as a whole, helping to eliminate air pollution, alleviate traffic congestion, conserve energy, and stimulate economic development. *See,* policy statements in the Urban Mass Transportation Act, 49 U.S.C. §§ 1601, 1601a, and the National Mass Transportation Assistance Act of 1974, 49 U.S.C. § 1601b; *see also* Tex.Rev.Civ.Stat. Ann. art. 1118x, § 1 (Vernon 1982 Supp.). Moreover, public transit is provided at a heavily subsidized price. Fares are nominal and account for only about 25 percent of operating expenses. Affidavit of Wayne M. Cook, at paragraph 6 (filed April 30, 1980). While some of the fare subsidy is from federal funding, a larger portion is from tax revenues collected pursuant to Texas statute. *Id.* The decision by the State of Texas to grant regional transit authorities an independent tax base and the election by San Antonio area voters to impose such a tax on themselves is another indication that public transit benefits the community as a whole.

The reality of transit industry economics is that services cannot be provided at a profit. *See,* 49 U.S.C. § 1601b(3), (4). Even with federal funds available, state and local tax dollars remain the predominate source of support. *See,* Financing Transit at 36. This is a clear indication that government provides transit for public service, not for pecuniary gain. These same facts indicate that government is particularly well suited to provide transit services. In the absence of a profit motive to attract private enterprise, government is the only component of society that can provide the service.

Finally, government is today the primary provider of transit services. When the total number of transit operations in the United States are counted without respect to size, state and local government owns and oper-

ates only about half the service. But, this is a misleading figure because state and local government provides the overwhelming majority of transit services. By 1978, public transit accounted for 91 percent of total vehicle miles, 91 percent of linked passenger trips, 90 percent of revenues generated, and 87 percent of transit vehicles operated. *Kramer,* 677 F.2d at 309.

## IV. Conclusion

■ The import of *LIRR* is two-fold. First, Tenth Amendment claims must be supported by a showing, based on historical reality or other factors, that when a line between state and federal prerogatives must be drawn, performance of the function at issue falls so clearly on the states' side of the line that imposition of federal authority would undermine the role of the states in our federal system. History indicates that transit falls on the states' side of the line. So do analogy to the *Usery* functions and application of the *Amersbach* test.

Second, *LIRR* announces a limitation on Tenth Amendment immunity. Notwithstanding indications from history or other factors, states and their political subdivisions may not erode existing federal authority by assuming ownership and operation responsibilities for functions previously performed by the private sector. No such federal authority exists to be eroded in the area of transit. The FLSA provisions challenged here are recent departures from an earlier policy in which Congress recognized states' interest in wage and hour regulation by exempting states. Even the federal regulation that deals most comprehensively with transit, UMTA, declined to impose federal authority, opting instead for a system of voluntary cooperation that recognizes the states' predominate interest in transit.

■ This Court finds that the imposition of FLSA wage and overtime pay provisions on state transit workers would undermine the states' role as surely as would the imposition of the same provisions on state employees performing police, fire, sanitation, health, and recreational services. It is, therefore, ORDERED that Summary Judg-

ment be, and hereby is, reentered in favor of Plaintiff and Plaintiff-Intervenor, and Defendant's and Defendant-Intervenor's Motions for partial Summary Judgment be, and hereby are DENIED.