677 F.2d 308
 25 Wage & Hour Cas. (BN 581, 94 Lab.Cas. P 34,187
 Robert M. KRAMER, Luther A. Miller, Donald Pettitt, Howard
N. Barnes, David R. Shaw, Gerald J. Maggie, Ernest Orelli,
Phillips C. Reed, James W. Burns, G. Maxine Pardick, Martha
E. Keith, James L. Ramsey, Clyde W. Reed, Ralph L. Jones,
Phillips W. Reed, John P. Carson, Robert C. Burnwick, David
C. Matthews, Walter R. Slack, William L. Hanna, Louis V.
Pagliaro, and all other plaintiffs similarly situated, Appellants,
v.
NEW CASTLE AREA TRANSIT AUTHORITY.
 No. 81-2223.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 4, 1982.
Decided April 30, 1982.
Rehearing and Rehearing En Banc Denied May 25, 1982.
 
 Joseph J. Pass, Jr., Edward H. Walter (argued), Jubelirer, Pass & Intrieri, P. C., Pittsburgh, Pa., for appellants.
 Frank G. Verterano (argued), Gamble, Verterano, Mojock, Piccione & Green, New Castle, Pa., William T. Coleman, Jr., Donald T. Bliss, O'Melveny & Myers, Washington, D. C., for appellee.
 T. Timothy Ryan, Jr., Sol. of Labor, Beate Bloch, Associate Sol., Lois G. Williams, Deputy Associate Sol., Joseph M. Woodward, Leif Jorgenson, Attys., U. S. Dept. of Labor, Washington, D. C., for amicus curiae, American Public Transit Ass'n; Robert W. Batchelder, Gen. Counsel, Washington, D. C., of counsel.
 J. Paul McGrath, Asst. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., for amicus curiae, United States of America.
 Before GIBBONS, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 Twenty-one plaintiffs, employed as bus operators by the New Castle Area Transit Authority (the Authority), appeal from the grant of summary judgment in favor of the defendant in their suit for overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (FLSA). The Authority is a political subdivision of the Commonwealth of Pennsylvania, and the district court dismissed the complaint in reliance on National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). We reverse.
 
 
 2
 In National League of Cities v. Usery, the Court held that the tenth amendment prevented the application of the overtime pay provisions of FLSA to employees of states and their political subdivisions who were engaged in traditional governmental functions. Id. at 855, 96 S.Ct. at 2475. A nonexclusive list of such traditional functions included police protection, sanitation, public health, parks and recreation, hospitals, and schools. The National League of Cities case afforded little guidance, however, as to the identification of traditional functions. More recently we have been afforded clarification. In Hodel v. Virginia Surface Mining & Reclamation Association, Inc., 452 U.S. 264, 287-88, 101 S.Ct. 2352, 2365-2366, 69 L.Ed.2d 1 (1981), the Court announced a three part test for evaluating whether a commerce clause regulation contravenes the tenth amendment:
 
 
 3
 (I)n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of National League of Cities must satisfy each of three requirements. First, there must be a showing that the challenged regulation regulates the "States as States." Second, the federal regulation must address matters that are indisputably "attribute(s) of state sovereignty." And third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional governmental function." (Citations omitted).
 
 
 4
 That test was reiterated in United Transportation Union v. LIRR, --- U.S. ----, ----, 102 S.Ct. 1349, 1354, 71 L.Ed.2d ---- (1982). We assume, as did the district court, that the first two requirements of this conjunctive test are satisfied, and concentrate, as did the Court in United Transportation Union, on the third. In that case the Court emphasized that while "emphasis on traditional governmental functions and traditional state sovereignty was not meant to impose a static historical view of state functions generally immune from federal regulation," --- U.S. at ----, 102 S.Ct. at 1354, the historical reality of the activity in question could not be ignored. States are not free to assume functions historically performed by the private sector and thereby insulate those activities from federal regulation of interstate commerce.
 
 
 5
 Local mass transit systems have historically been owned and operated by private companies. Some public operation started in the early part of this century-Seattle (1911), San Francisco (1912), Detroit (1921), and New York (1932)-yet as late as 1960, 95% of transit companies in the nation were privately owned and operated. H.R.Rep.No.204, 88th Cong., 2d Sess., reprinted in, (1964) U.S.Code Cong. & Ad.News, 2569, 2590. In 1964, Congress passed the Urban Mass Transportation Act of 1964, Pub.L.No.88-365, 78 Stat. 302, codified at 49 U.S.C. §§ 1601 et seq., (UMTA) in recognition of the difficulties being experienced by the private mass transit industry. The principal purpose of the Act was to "provide (federal) assistance to State and local governments and their instrumentalities in financing ... (transportation) systems, to be operated by public or private mass transportation companies as determined by local needs." 49 U.S.C. § 1601(b)(3).
 
 
 6
 The UMTA put inexorable forces in motion whereby, at an accelerated pace, transportation companies changed hands from the private sector to the public sector. By 1978, local publicly owned transit systems received 90% of the revenues from all transit operations; accounted for 91% of total vehicle miles operated and 91% of all linked passenger trips; and owned or leased 87% of total transit vehicles. (Scheuer Affidavit-App. 20a). Nonetheless, between 45 and 52% of all transit operations (counting each system, irrespective of size, as one unit) were privately owned. U. S. Dep't of Transportation, Urban Mass Transportation Administration, A Directory of Regularly Scheduled, Fixed Route, Local Rural Public Transportation Service, 6 (1980); U. S. Dep't of Transportation, Urban Mass Transportation Administration, A Directory of Regularly Scheduled, Fixed Route, Local Public Transportation Service, 17 (1979); Scheuer Affidavit (App. 20a). The federal government is actively involved in local mass transportation. It provides: (1) capital grants, funded on a "80% federal/20% local" matching basis; (2) operating grants, on a "50% federal/50% local" matching basis; and (3) technical assistance to state and local planning agencies on an "80% federal/20% local" matching basis.
 
 
 7
 We think that the state involvement in local transit systems, increasing with more systems coming under state control in recent years, does not alter the "historical reality" that the operation of mass transit systems "is not among the functions traditionally performed by state and local governments." Cf. United Transportation Union v. LIRR, --- U.S. ----, ----, 102 S.Ct. 1349, 1354, 71 L.Ed.2d ---- (1982) (same conclusion reached with respect to commuter railroads). The whole move away from private transit systems and into public systems was started and effected by the federal government which provided the financial support to allow the changeover to public transportation companies. Moreover, the federal government has, through the matching funds programs, maintained an intimate involvement with the operation of such public systems. The result has been a network of publicly run systems which are cooperations between the federal government and the states. The tradition that has evolved encompasses not only state involvement in local mass transportation but also an important federal role in the matter. The Authority cannot recast this development as one in which the states took over transit services on their own while the federal government only provided post hoc financial assistance. Massive state involvement with mass transit was created by the national government and the states are precluded from claiming, at this late date, that mass transit is a service which they traditionally provide. Tradition must be gauged in light of what actually happened, and what happened is a federal program of local transit service in which the states participate as late comer junior partners. There is, therefore, no tradition of the states qua states providing mass transportation.[1] Moreover, since it is undisputed that the national government can set the employment relations in the area of mass transit, it would be unjustified to allow the states, by acquiring functions previously performed by the private sector, to erode federal authority in this area. See generally, United Transportation Union, supra, --- U.S. at ----, 102 S.Ct. at 1354.
 
 
 8
 Judge Garth, concurring, prefers to rest his decision upon language in United Transportation Union, supra, to the effect that before federal regulatory legislation violates the tenth amendment it must have the effect of endangering a state's separate and independent existence, and hampering its ability to fulfill its role in the Union. While we do not disagree with his observation that such a federal regulatory scheme is almost inconceivable, and recognize that National League of Cities may in fact have been overruled, we prefer to decide this case on the narrower grounds discussed above, leaving to another day consideration of the full reach of the United Transportation Union case.
 
 
 9
 The judgment appealed from is reversed and the case remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 10
 GARTH, Circuit Judge, concurring.
 
 
 11
 While unquestionably the history and operation of the New Castle Area Transit Authority differs from the history and operation of the Long Island Railroad, the Supreme Court's analysis in United Transportation Union v. Long Island Railroad, --- U.S. ----, 102 S.Ct. 1349, 71 L.Ed.2d ---- (1982) clearly indicates that the Authority is subject to the provisions of the Fair Labor Standards Act. Even though the Authority, a state instrumentality, has operated the bus system which is the subject of this action since 1958, in terms of Hodel v. Virginia Surface Mining and Reclamation Association, Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) and LIRR, supra, it is apparent that the Authority is not providing a service which has "traditionally" been performed by state governments.
 
 
 12
 I prefer resting my decision in this case on the ultimate, and I think more definitive, test announced in LIRR. In my opinion, the crucial standard by which the Authority's immunity from FLSA must be measured is, do "the federal regulations affect basic state prerogatives in such a way as would be likely to hamper the state government's ability to fulfill its role in the union and endanger its 'separate and independent existence.' " --- U.S. at ----, 102 S.Ct. at 1354.
 
 
 13
 Chief Justice Burger writing for the majority in LIRR, held that the application of the Railway Labor Act to New York's operation of the Long Island Rail Road, would not have the effect of endangering New York's "separate and independent existence" as a state. In so holding, it appears to me that the Supreme Court has now virtually restricted the rule of National League of Cities, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) to the particular and peculiar facts of that case. I find it almost impossible to hypothesize very many other circumstances in which federal regulations would endanger the separate and independent existence of a state.[1] Thus, it seems to me that while different conclusions, each of which may be valid in its own right, might be reached as to whether a particular state function is a "traditional" function, there can be little dispute in my opinion, as to whether a state's very existence will be endangered by a particular federal Statute or Regulation. In effect therefore, the "endangering" test announced by the Court, whatever its wisdom, appears to me to have the undeniable virtue of being more certain in application than the "traditional function" test. By being more certain in application, it will undoubtedly have the effect of forestalling disputes of the type presented by the instant case.
 
 
 14
 Having been instructed that subjecting the Long Island Rail Road to the Railway Labor Act would not threaten the "separate and independent existence" of New York as a state, I can hardly maintain otherwise with respect to the application of the FLSA to the operation of the New Castle Area Transit Authority. Thus, tested by the standard of "endangering a state's separate and independent existence," I agree with Judge Gibbons that the order of the district court granting summary judgment for the Authority, must be reversed.
 
 
 
 [1]
 Defendant contends that, since private local transportation companies are doomed to extinction, state involvement is necessary and inescapable: that state provision of these services is the new "reality." We do not agree. Defendant's argument, as a logical construct, only goes to the determination of the "public vs. private" nature of local mass transit, it does not go to the "state vs. federal" nature of governmental involvement. What the defendant, at best, shows is that government must shoulder the burden abandoned by the private sector. This does not answer the federalism issue before us, i.e., whether local transportation services are traditional state functions immunized from federal regulation by the tenth amendment
 
 
 [1]
 In New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1945), the Supreme Court held that the State of New York could be taxed by the federal government on the sale of mineral waters taken from Saratoga Springs and therefore New York was not immune from taxation under § 615(a)(5) of the 1939 Internal Revenue Act which imposed a tax on mineral waters
 Chief Justice Stone in his concurring opinion stated:
 But in view of our former decisions we could hardly say that a general non-discriminatory real estate tax (apportioned), or an income tax laid upon citizens and States alike could be constitutionally applied to the State's capital, its State-house, its public school houses, public parks, or its revenues from taxes or school lands, even though all real property and all income of the citizen is taxed.
 Only when and because the subject of taxation is State property or a State activity must we consider whether such a non-discriminatory tax unduly interferes with the performance of the State's functions of government. If it does, then the fact that the tax is non-discriminatory does not save it.
 The Chief Justice qualified his opinion by quoting from Metcalf & Eddy v. Mitchell, 269 U.S. 514, 523-24, 46 S.Ct. 172, 174, 70 L.Ed. 384:
 But neither government may destroy the other nor curtail in any substantial manner the exercise of its powers. Hence the limitation upon the taxing power of each, so far as it affects the other, must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to to impair either the taxing power of the government imposing the tax ... or the appropriate exercise of the functions of the government affected by it. Metcalf & Eddy v. Mitchell, supra, 523-24, 46 S.Ct. at 174.