Charles BRUSSTAR, on his own behalf and on behalf of all others similarly situated

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.

Civ. A. No. 85–3773.

United States District Court, E.D. Pennsylvania.

June 23, 1986.

G. Sander Davis, O'Brien & Davis, P.C., Philadelphia, Pa., for plaintiffs.

James A. Matthews, III, Drinker, Biddle & Reath, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, Chief Judge.

This is an action by employees[1] of the Southeastern Pennsylvania Transportation Authority (SEPTA) to recover unpaid overtime wages allegedly due under § 7(a) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(a). Plaintiffs have moved for partial summary judgment on the issue of liability, contending that SEPTA, a political subdivision of the Commonwealth of Pennsylvania, is obligated to comply with the FLSA. For the reasons stated below, I will grant plaintiffs' motion.

Under the FLSA, employees must be paid for time worked in excess of 40 hours per week at a rate of one and one-half times their normal pay rate. 29 U.S.C. § 207(a)(1). The statutory work week includes all time spent performing activities which "are an integral and indispensable part of the principal activities for which covered workmen are employed." *Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 335, 100 L.Ed. 267 (1956).

When the FLSA was passed in 1938, it specifically excluded states and their political subdivisions from its coverage. Since 1961, however, Congress has gradually broadened the FLSA's coverage. As amended in 1974, the FLSA imposes minimum wage and maximum hour requirements upon most public employers, specifically including states and their political subdivisions. *See National League of Cities v. Usery,* 426 U.S. 833, 836–39, 96 S.Ct. 2465, 2467–68, 49 L.Ed.2d 245 (1976).

In *National League of Cities v. Usery,* the Supreme Court decided that the Tenth Amendment prohibits application of the FLSA's wage and hour provisions to state employees engaged in traditional governmental functions. After a series of decisions narrowly construing this holding, *e.g., Hodel v. Virginia Surface Mining & Reclamation Association,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *United Transportation Union v. Long Island Rail Road Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982); *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), the Supreme Court overruled *National League of Cities* in *Garcia v. San Antonio Metropolitan Transit Au-*

---

**1.** Plaintiff Charles Brusstar originally filed this suit as a class action. The FLSA, however, provides that no employee is party to an action to recover minimum or overtime wages "unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). Brusstar has accordingly filed over 200 consent forms signed by SEPTA employees. The employees on whose behalf these forms were submitted are the plaintiffs in this case.

*thority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). The majority opinion, in which five Justices joined, stated that "the attempt to draw the boundaries of state regulatory immunity in terms of 'traditional governmental function' is not only unworkable but is inconsistent with established principles of federalism." *Id.* at ——, 105 S.Ct. at 1007.

The pre-*Garcia* agreement between SEPTA and its employees provided for overtime compensation only after 45 hours of work. Certain hours spent performing work-related activities were not included in the computation of overtime. SEPTA recognizes that *Garcia* requires it to modify its compensation practices in accordance with the FLSA. The dispute between the parties concerns SEPTA's pre-*Garcia* liability. Plaintiffs contend that even before *Garcia* was decided the Third Circuit had held that operation of a local mass transit system was not a traditional state or local government function, and that a publicly owned transit authority was therefore subject to the FLSA. *See Kramer v. New Castle Area Transit Authority*, 677 F.2d 308 (3d Cir.1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 786, 74 L.Ed.2d 993 (1983). Accordingly, plaintiffs claim they are entitled to unpaid overtime wages as of April 30, 1982, the date of the *Kramer* decision. They have moved for partial summary judgment on the ground that *Kramer* controls the question of SEPTA's liability. SEPTA, in opposing plaintiffs' motion, contends that *Kramer* was wrongly decided. SEPTA also argues that much of the *Kramer* opinion is dictum, and that the case is distinguishable.

■ I note first that, contrary to SEPTA's apparent desire that I do so, I am not free to reconsider or reject the Third Circuit's holding in *Kramer*. *Kramer* remains the law of this circuit unless or until it is overruled.[2] I will therefore confine myself to the question of whether *Kramer*, as a matter of law, precludes SEPTA from arguing that it was exempt from the FLSA until the Supreme Court decided *Garcia*.

In *Kramer*, the Third Circuit concluded that "the operation of mass transit systems 'is not among the functions *traditionally* performed by state and local governments.'" *Kramer*, 677 F.2d at 310 (quoting *United Transportation Union v. Long Island Rail Road Co.*, 455 U.S. at 686, 102 S.Ct. at 1355). The court emphasized that local mass transit systems have historically been privately owned and operated. State involvement became common only after Congress passed the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1601 *et seq.*, which provided for federal assistance to state and local governments operating transportation systems. According to the Third Circuit, "[t]he whole move away from private transit systems and into public systems was started and effected by the federal government which provided the financial support to allow the changeover to public transportation companies." *Kramer*, 677 F.2d at 310. Moreover, the federal government is actively involved, both financially and otherwise, in local mass transportation. The Third Circuit thus held that "the states are precluded from claiming, at this late date, that mass transit is a service which they traditionally provide." *Id.*

SEPTA claims that the Third Circuit's broad language is dictum, and that *Kramer* stands only for the proposition that the New Castle Area Transit Authority was not performing traditional governmental functions. Thus, SEPTA contends, it must be given the opportunity to demonstrate that its role is different.

■ I disagree with SEPTA's characterization of *Kramer*. The Third Circuit's holding was based on a broad perception of history, not merely on an analysis of the specific role and background of the New Castle Area Transit Authority. The whole concept of a "traditional governmental function" requires that a court not focus exclusively on the specific state entity but consider whether the activity is one in which states have historically been in-

**2.** SEPTA does claim that the Supreme Court in *Garcia* implicitly overruled *Kramer* by not explicitly approving it. I find nothing in the language or tenor of the *Garcia* decision to support this position.

volved. According to the Supreme Court, the test of whether a federal regulatory scheme directly impairs the states' ability to perform integral functions depends upon a "generalized inquiry, essentially legal rather than factual." *EEOC v. Wyoming*, 460 U.S. at 240, 103 S.Ct. at 1062. *See also United Transportation Union v. Long Island Rail Road Co.*, 455 U.S. at 685–90, 102 S.Ct. at 1354–57 (using a broad historical analysis as a basis for determining that operation of an interstate railroad is not a traditional state activity). The Third Circuit's general conclusions concerning state involvement in local mass transportation are not dicta, but essential elements of its decision.

■ In light of *Kramer*'s expansive language, I believe that a fact-specific inquiry into SEPTA's background is inappropriate. In order to complete the record, however, the parties have at my suggestion submitted stipulations of fact concerning the history of SEPTA and of local mass transportation in southeastern Pennsylvania.[3] I have reviewed those stipulations and conclude that, even if details concerning a specific state instrumentality were relevant, SEPTA has not presented evidence which would distinguish this case from *Kramer*. According to the parties' stipulations, local mass transit systems in southeastern Pennsylvania were privately owned and operated until 1968, when SEPTA acquired the Pennsylvania Transportation Company. The parties agree, however, that Pennsylvania state and local governments have been involved in local mass transportation since the mid-nineteenth century, through construction of facilities and provision of subsidies, equipment and planning assistance. The federal government has contributed between 19 and 38% of SEPTA's yearly operating subsidies since 1975, and has granted SEPTA approximately $865 million in capital funds since 1964. *See* Stipulation of Uncontested Facts Submitted by the Plaintiff, ¶¶ 7–11.

SEPTA claims its scope of operations and its long history of local government involvement distinguish it from the New Castle Area Transit Authority. In addition, SEPTA stresses that the federal government's only role in southeastern Pennsylvania's local mass transportation systems has been as a limited funding source.

As plaintiffs contend, however, similar evidence and arguments were before the Third Circuit when it decided *Kramer*. In support of their position, plaintiffs have submitted two affidavits which were filed in *Kramer*. The affidavit of John A. Christofer, General Manager of the New Castle Area Transit Authority, stated that the Authority was created by the municipality of New Castle in 1958 and received no federal funding until 1979–80. The affidavit of Herbert J. Scheuer, Executive Director-Administration of the American Public Transit Association, set forth a detailed history of state and local government involvement in mass transportation, beginning in the early 1900s. The Third Circuit cited the Scheuer affidavit as authority for several factual assertions. *Kramer*, 677 F.2d at 309–10. Nevertheless, the court held that "the state involvement in local transit systems, increasing with more systems coming under state control in recent years, does not alter the 'historical reality' that the operation of mass transit systems" is not a traditional governmental function. *Id.* at 310.

This statement, in my view, disposes of SEPTA's factual arguments and mandates entry of partial summary judgment in favor of plaintiffs.[4]

---

**3.** The stipulated facts are set forth in two documents, both of which were signed by counsel for plaintiffs and defendant: a Stipulation of Facts, attached to this Opinion as Appendix A; and a Stipulation of Uncontested Facts Submitted by the Plaintiff, attached as Appendix B. The parties also submitted Exhibits to the Stipulation of Facts, which are not attached.

**4.** Plaintiffs have also argued that the Supreme Court's holding in *Garcia* can be retroactively applied. Because I conclude that SEPTA was required under *Kramer* to comply with the FLSA, I need not reach the question of *Garcia*'s retroactivity. I note, however, that the Third Circuit has refused to apply *Garcia* retroactively in a case involving the Port Authority of New York and New Jersey. *Mineo v. Port Authority*, 779 F.2d 939, 940 (3d Cir.1985) (retroactive application is not appropriate "on the facts presented by this case").

Entry of partial summary judgment leaves several matters still open. Questions concerning damages and concerning whether a two or three-year statute of limitations applies under 29 U.S.C. § 255 remain to be decided. Defendant notes that these questions are complex and requests that I certify my order granting plaintiffs' motion as immediately appealable under 28 U.S.C. § 1292(b).

Section 1292(b) provides, in pertinent part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

Although the question of *Kramer*'s effect upon this case is a controlling question of law, I cannot conclude that there is substantial ground for difference of opinion. Clearly, opinions may and do differ as to whether the holding in *Kramer* is desirable as a matter of social policy. I can perceive little ground, however, for questioning either that *Kramer* governs this case or that it is consistent with Supreme Court precedent. *See United Transportation Union v. Long Island Rail Road Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (operation of a railroad in interstate commerce is not a traditional governmental function). *See also Garcia,* — U.S. at —, 105 S.Ct. at —; *Dove v. Chattanooga Area Regional Transportation Authority,* 701 F.2d 50 (6th Cir.1983); *Alewine v. City Council,* 699 F.2d 1060 (11th Cir.1983) (relying on *Kramer* in holding that public mass transit is not a traditional governmental function), *cert. denied,* — U.S. —, 105 S.Ct. 1391, 84 L.Ed.2d 781 (1985); *Joiner v. City of Macon,* 627 F.Supp. 1532, 1536 (M.D.Ga.1986) ("even after the Supreme Court's decision in *National League,* the federal appellate courts ... and the U.S. Department of Labor regulations ... consistently applied FLSA to publicly owned mass transit systems.").

Accordingly, I will deny SEPTA's request for certification under § 1292(b).

### ORDER

This 23rd day of June, 1986, it is

ORDERED that:

1. Plaintiffs' Motion for Partial Summary Judgment is GRANTED;

2. Defendant's Request for Certification of this Order as immediately appealable under 28 U.S.C. § 1292(b) is DENIED.

### APPENDIX A

### STIPULATION OF FACTS

The Plaintiffs and the Defendant, Southeastern Pennsylvania Transportation Authority ("SEPTA" or the "Authority"), by their undersigned attorneys, stipulate and agree, for purposes of this litigation only, to the following facts and to the authenticity of the documents identified herein:

### I. PRESENT LEGAL AND OPERATIONAL STRUCTURE OF SEPTA

1. SEPTA is an instrumentality of the Commonwealth of Pennsylvania, presently organized and existing under the provisions of the Pennsylvania Urban Mass Transportation Law, 55 P.S. § 600.101 *et seq.* (the "UMTL"). SEPTA's creation and continued existence is authorized by Section 600.303(a) of the UMTL. The UMTL was enacted by the Pennsylvania Legislature based upon the following legislative findings and policy declarations:

> "(a) It is hereby determined and declared as a matter of legislative finding:
>
> (1) That there exists in the urban and suburban communities in metropolitan areas, traffic congestion and serious mass transportation problems because of underdeveloped, uncoordinated obsolete mass transportation facilities resulting in inadequate or overcrowded high cost conditions on our highways and existing mass transportation facilities.
>
> (2) That such conditions or a combination of some or all of them have made and will continue to result in making

such communities economic and social liabilities, harmful to the social and economic well being of the entire area, depreciating values therein, reducing the tax revenues, making the metropolitan areas and their constituent communities less desirable areas in which to live and work and thereby depreciating further the general community-wide values.

(3) That the foregoing conditions cannot be effectively dealt with by private enterprise under existing law without the additional aids herein granted and are beyond remedy or control by governmental regulatory processes.

(4) That the sound replanning and redevelopment of metropolitan mass transportation facilities in accordance with sound and approved plans for their promotion, development and growth will promote the public health, safety, convenience and welfare and that the public acquisition of existing mass transportation facilities in accordance with the said sound plans for their redevelopment and promotion will promote the public health, safety, convenience and welfare.

(5) That the well-being and economic health of the counties and other communities in the metropolitan areas require integrated systems of mass passenger transportation.

(6) That it is desirable that the public transportation systems in the metropolitan areas be combined, improved, extended and supplemented by the creation of authorities as herein provided.

(7) That the establishment of metropolitan transportation authorities will promote the public safety, convenience and welfare.

(8) That it is intended that such authorities cooperate with and/or acquire existing transportation facilities that private enterprise and government may mutually provide adequate transit facilities for the convenience of the public.

(9) That it is intended that any authority created hereunder will cooperate with all municipalities and other public bodies in whose territories it operates so that the mass passenger transportation system may best serve the interests of the residents thereof.

(b) Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to promote the safety and welfare of the inhabitants thereof by authorizing the creation of a body corporate and politic for each metropolitan area, to be known as the transportation authority of such area, which shall exist and operate for the purposes contained in this article. Such purposes are hereby declared to be public uses for which public money may be spent and private property may be acquired by the exercise of the power of eminent domain."

55 P.S. § 600.301.

2. SEPTA is governed by a Board of Directors consisting of two members each appointed by the City of Philadelphia and the Counties of Bucks, Chester, Delaware and Montgomery; and one member appointed by the Governor of Pennsylvania.

3. Section 600.303(d) of the UMTL vests SEPTA with, among other powers and duties, the following:

"(15) To acquire by eminent domain any real or personal property including improvements, fixtures and franchises of any kind whatever for the public purposes set forth in this article in the manner hereinafter provided.

\* \* \* \* \* \*

(25) To act as agent of the State, or of the Federal Government or any of its instrumentalities or agencies, for the public purposes set out in this article.
(26) To conduct examinations and investigations and to hear testimony and take proof, under oath or affirmation at public or private hearings, as hereinafter provided, on any matter material to the public purposes set forth in this article.
(27) To make available to the government of a municipality or any appropriate agency, board or commission thereof, the recommendations of the authority affecting any area in the authority's field of operation or property therein, which it may deem likely to promote the public health, morals, safety and welfare.

(28) To form plans for the improvement of mass transportation in order to promote the economic development of the metropolitan area in which the transportation authority operates; to make recommendations concerning mass transportation facilities which the authority does not own or operate; to make recommendations concerning throughways and arterial highway connections to the department of transportation and to other appropriate governmental bodies; and otherwise to cooperate with all such governmental bodies. The authority shall give advance notice to the Department of Transportation of any plans which it may have for the occupation or use of any part of any State highway."

55 P.S. § 600.303(d).

4. Section 600.340 of the UMTL vests SEPTA with the authority to conduct public hearings and investigations, administer oaths and subpoena witnesses.

"(a) The board may investigate all means of transportation and the management thereof, the enforcement of its resolutions, rules and regulations, and the action, conduct and efficiency of all officers, agents and employees of the authority. In the conduct of such investigations, the board may hold public hearings on its own motion and shall do so on complaint or petition of any municipality in the metropolitan area. Each member of the board shall have power to administer oaths and the secretary, by order of the board, shall issue subpoenas to secure the attendance and testimony of witnesses and the production of books and papers relevant to such investigations and to any hearing before the board or any member thereof, or any officers' committee or employees' committee, appointed by the board to hear any complaint of an officer or employee who has been discharged or demoted.

(b) Any court of record of this Commonwealth, or any judge thereof, either in term time or vacation, upon application of the board or any member thereof may, in his discretion, compel the attendance of witnesses, the production of books and papers, and giving of testimony before the board or before any member thereof, or any officers' committee or employees' committee, appointed by the board by attachment for contempt or otherwise, in the same manner as the production of evidence may be compelled before said court."

5. SEPTA is the third largest public transit agency in the United States. In fiscal 1984, SEPTA carried an average of 1,224,000 passengers each day for a total of 256,000,000 passenger trips that year.

6. SEPTA is organized into City and Suburban Transit and Commuter Rail Divisions operating through the City of Philadelphia, Bucks, Chester, Delaware and Montgomery Counties.

## II. HISTORY OF PHILADELPHIA MASS TRANSIT

7. The first hourly stage coach service in Philadelphia began in 1831. This service was replaced by horsedrawn streetcars. Private streetcar companies grew in number throughout the early 1850's.

8. The proliferation of private street car lines and the resulting conflicts among them, disputes over street maintenance and the like led in 1855 to the formation by the Philadelphia Common Councils of a "Special Committee on City Passenger Railroads." In particular, the City could not then afford to build a system of its own, but many objected to the profits which would follow the grant of exclusive, private franchises. The result of the Committee's investigation was a report by Chief City Engineer Strickland Kneuss recommending a franchise system and concluding:

"If it is advisable (and I agree such is the case) that a commitment be made at once, such contracts [i.e., franchises] should be entered into with capitalists who seek the investment, as will enable the City to obtain the possession of the roads as soon as the financial condition of its treasury will permit, or whatever arrangement to reach that point Council may decide upon."

9. The Common Councils provided for the grant of streetcar franchises in the

Ordinance of July 7, 1857 which provided, among other things, that upon grant of a franchise and issuance of Articles of Incorporation by the State:

"the directors of any such company or companies shall, immediately after the completion of any passenger railroad in the city, file, in the office of the City Solicitor, a detailed statement, under the seal of the company, and certified under oath or affirmation by the president and secretary, of the entire cost of the same; and the City of Philadelphia reserves the right at any time to purchase the same, by paying the original cost of said road or roads and cars at a fair valuation. And any such company or companies refusing to consent to such purchase shall forfeit all privileges, rights and immunities they may have acquired in the use or possession of any of the highways as aforesaid."

10. The franchisees were also required to repair and maintain the streets over which they operated. This latter obligation was reasserted as to all franchises by ordinance in 1874. Between 1857 and 1874, 39 street railway companies were formed in Philadelphia. During this same period of time, those companies which did exist were allying and, later, merging with each other. On May 24, 1859, the Board of Presidents of City Passenger Railway Companies was formed to attempt standarized rates through common regulations. In 1883, the Philadelphia Traction Company was formed for the purpose of buying or leasing the rights and equipment of existing smaller companies. This trend continued and, by 1893, all but one of the 39 companies were owned, or their property leased by, three large companies: the Philadelphia Traction Co., the Electric Traction Co., and the Peoples' Traction Co.

11. On September 6, 1895, virtually all of the street railway lines merged to form the Union Traction Company. Disputes arose almost immediately as Union attempted to use its monopoly power to raise fares and end free transfers. By December 5, 1895, the Common Councils had threatened to exercise the City's reserved rights of purchase contained in the franchises of Union's underlying companies. This controversy continued through 1902.

12. In 1902, Union merged with the remaining street railway companies to form the Philadelphia Rapid Transit Company (the "PRT"). Between 1902 and 1907, the PRT and the City engaged in ongoing negotiations. In 1907, the parties reached agreement. The 1907 agreement, a copy of which is attached as Exhibit "A", was ratified by the Common Councils and provided, among other things:

(a) The PRT could not increase its debt or make capital expenditures without approval of the city;

(b) The City was given the right to insist upon capital improvements it desired.

(c) The City was given three seats on the PRT Board of Directors;

(d) The PRT was required to file sworn financial statements with the City and could not pay dividends of more than six percent of post 1907 capital additions without a like payment to the City;

(e) the PRT assigned to the City its right (obtained from a predecessor) to build the Broad Street subway;

(f) The PRT was required to establish a sinking fund for the City's benefit; and

(g) The City reserved the right to purchase the PRT at stated capital value on or after July 1, 1957 and to use the sinking fund for that purpose.

13. The decade of 1910–1920 passed without further agreement between the City and the PRT with respect to the construction of new subway and train lines.

14. In 1913, the Pennsylvania Legislature authorized cities of the first class to form and operate their own transit operations. A copy of the legislation is attached as Exhibit "B". Philadelphia formed a Department of Public Transit in that year and its Commissioner recommended (a) building new subway routes, including the Broad Street Line; (b) a train line to Darby; (c) a train line to Camden and (d) City creation of its own operating transit system if the PRT did not accede to the City's plans.

15. The City proceeded with construction of the Frankford Elevated between Second and Bridge Streets. Construction of that line began on September 13, 1915 and was completed on November 5, 1922.

16. The City and the PRT reached a new construction and operating agreement in 1922, which supplemented the 1901 Agreement and provided, among other things, (a) that the PRT rather than the City would actually operate the Frankford Elevated; (b) that the City would construct, and the PRT operate, a new trolley route from Margaret Street to Lott Street in the Northeast; and (c) that the City would build the Broad Street Subway.

17. The City completed construction of the Broad Street subway in 1928 and leased it to the PRT for a period of three months at a rent of $200,000 per month. Thereafter, the lease was extended for a series of four year terms.

18. Throughout the 1930's, the City extended the Broad Street subway to South Street (1930) and Snyder Avenue (1938); built the Broad-Ridge Subway Spur (1932) and constructed a subway tunnel under the Schuylkill River. In 1934, the PRT, unable to maintain its rental payments to the City and its underlying companies, filed for bankruptcy. After nearly six years of hearings and the approval of the State and the City Council, the PRT emerged from bankruptcy in 1940 as the Philadelphia Transportation Company (the "PTC").

19. There were no relevant events during World War II. In 1947 the City agreed with the PTC to modernize the city-owned Route 59 trolley line and to build a trolley-bus terminal at Castor and Bustleton Avenues to be operated by the PTC. In 1948, the City refurbished a number of their city-owned and PTC-operated transit facilities.

20. Between 1950 and 1955, the City extended the Market-Frankford subway west from 23rd Street to 45th Street (through the city-built Schuylkill River Tunnel), replacing the PTC owned elevated line, and extended the subway-surface lines underground to 40th and Woodland. In 1953, the City built the Locust Street Subway (now part of the PATCO High Speed Line). In 1956, the City extended the Broad Street Subway north to Fern Rock. At the end of the decade, the City purchased 270 cars for use by the PTC on the Market-Frankford line.

21. In 1952, the City and surrounding counties cooperated in developing the "Philadelphia Plan" to discourage private automobile traffic in the City through increased use of mass transit. On March 31, 1953, Philadelphia's Bureau of Municipal Research released a report undertaken at the request of the Mayor entitled "Proposed Organization to Recommend an Urban Transportation Traffic Policy and Program for the City of Philadelphia." A copy of this report is attached as Exhibit "C". After this report was released, the Mayor appointed members to the Urban Traffic and Transportation Board (the "UTTB"), to act in an advisory capacity. In 1956, the UTTB recommended that suburban rapid transit be improved by integrating transit services into a regional system with coordinated routes, fares and transfers. As a result, Philadelphia City Council authorized cooperation with and funding for a plan for an increased City subsidized railroad service on the Pennsylvania Railroad and Reading Company Chestnut Hill lines.

22. The 1907 City-PRT agreement was to expire in July 1957. In 1956, the PTC announced that it intended to build a new headquarters facility at Third and Wyoming Avenues and to borrow the money to do so. The City sued to enjoin the project, asserting its rights under the 1907 agreement to prevent the assumption of new debt by the PRT (and, by extension, the PTC) as well as its reserved right to purchase the Company after July, 1957. The litigation was settled with a five-year extension of the operating agreement.

23. On or about February 5, 1960, the City created a non-profit corporation known as the Passenger Service Improvement Corporation of Philadelphia (the "PSIC"). PSIC was formed, inter alia, "[t]o promote, maintain and improve passenger service" in Philadelphia and to provide "the best and most economical public passenger service." PSIC was authorized

"[t]o act as the management agent for the City of Philadelphia in connection with the operation and financing of passenger transportation facilities and rights." A copy of PSIC's Articles of Incorporation is attached hereto as Exhibit "D". On July 28, 1960 the City Council appropriated $250,000 to the PSIC and authorized PSIC to enter into agreements with the Pennsylvania and the Reading to operate and maintain passenger transportation services in addition to the Chestnut Hill Lines. Over the next two years, the City Council appropriated in excess of two million dollars to subsidize the Pennsylvania Railroad's operation of the Chestnut Hill, Trenton and Manayunk lines and the Reading Company's operation of the Chestnut Hill, Shawmont and Fox Chase Lines, providing service both within and without the City limits. Further, the City agreed to purchase new electric railway passenger cars for use in this commuter service and to lease them to the railroads.

24. On September 8, 1961, aiming to solve their traffic and transportation problems on a joint, cooperative and regional basis, the City and Bucks, Chester and Montgomery Counties signed the Southeastern Pennsylvania Transportation Compact ("SEPACT"). A copy of the Southeastern Pennsylvania Transportation Compact is attached hereto as Exhibit "E". Between 1963 and 1965, funded by the constituent municipalities and some federal demonstration grants, SEPACT engaged in several projects to improve passenger rail service. A copy of SEPACT's 18-month report, which describes these projects is attached hereto as Exhibit "F". Among these projects was the integration of suburban bus routes with commuter rail service (Exhibit "G" at 9–10).

25. The 1956 City-PTC interim agreement expired in 1961 and the parties once again engaged in litigation over the PTC's obligations to reimburse the City for $1,815,000 in repair work on the Frankford Elevated. This litigation was settled, and the last City-PTC operating agreement signed, in 1962.

26. SEPTA was organized on February 17, 1964, pursuant to the Metropolitan Transportation Act of 1963, Act of August 14, 1963, No. 450, 66 P.S. § 2001, *et seq.* for the purpose of planning, acquiring, holding, constructing, improving, maintaining and operating an integrated transportation system in the Philadelphia Metropolitan Area. A copy of the Metropolitan Transportation Authorities Act of 1963 is attached hereto as Exhibit "H". On August 24, 1965, SEPACT and SEPTA entered into a management agreement. SEPACT engaged SEPTA to manage and supervise its activities and transferred necessary personnel to SEPTA. SEPTA agreed, among other things, to supervise SEPACT's agreements with the Pennsylvania Railroad and the Reading Company and to administer future agreements with those companies. A copy of the SEPACT/SEPTA management agreement is attached hereto as Exhibit "I". On November 1, 1965, PSIC and SEPTA entered into a management agreement which contained essentially the same provisions as that entered into by SEPACT and SEPTA. A copy of the PSIC/SEPTA Management Agreement is attached hereto as Exhibit "J". SEPACT was dissolved effective December, 1972.

27. In late 1964 and early 1965, SEPTA sought a negotiated purchase of the PTC. The PTC refused. On June 8, 1965, the City assigned to SEPTA its reserved right to purchase the PTC under the 1907 City-PRT agreement. SEPTA exercised that option on July 1, 1966. After litigation instituted by the PTC, the Pennsylvania and United States Supreme Courts upheld both the enforceability of the reserved right and the validity of the City's assignment of it to SEPTA. A federal lawsuit by the PTC challenging the enforcement of the purchase price formula of the 1907 agreement as violative of due process was dismissed.

28. In late February and early March, 1968, the PTC agreed to abide by the courts' decisions and, following a pledge by the City to offer "whatever support is necessary to assist SEPTA in raising funds to make the purchase, both PTC stockholders

and the SEPTA Board affirmed the purchase. The purchase was funded by a SEPTA bond issue.

29. SEPTA acquired the Philadelphia Suburban Transportation Company (the "Red Arrow") in 1970, the Frontier Division in March 1974 and portions of the former Reading and Pennsylvania Commuter Rail Lines in April 1976. The Red Arrow purchase was funded by a SEPTA bond issue. Beginning January 1, 1983, SEPTA undertook day-to-day operations of all commuter rail service previously operated by Conrail under contract with SEPTA.

30. In 1984 and 1985, the City completed construction of the Center City Commuter Tunnel and the Airport High Speed Line and contracted with SEPTA for their operations.

## III. *SEPTA FINANCIAL HISTORY*

31. SEPTA's operating revenue history is as follows:

Operating Subsidies
(% of total subsidy)

| Year Ended | Total Revenue | Local | | State | | Federal | |
|---|---|---|---|---|---|---|---|
| 2/28/65 | 126,656 | 120,000 | (100%) | –0– | | –0– | |
| 2/28/66 | 1,215,155 | 554,461 | (45.7) | 656,933 | (54.2) | –0– | |
| 2/28/67 | 5,081,853 | 2,180,199 | (42.9) | 2,901,654 | (57.0) | –0– | |
| 12/31/67 | 7/208/738 | 2,703,908 | (37.8) | 4,273,173 | (59.7) | 175,321 | (2.4) |
| 12/31/68 | 29,089,453 | 3,358,945 | (34.5) | 5,892,575 | (60.5) | 479,947 | (4.9) |
| 12/31/69 | 90,472,597 | n/a * | | n/a | | –0– | |
| 12/31/70 | 98,893,495 | n/a * | | n/a | | –0– | |
| 12/31/71 | 101,010,556 | 1,087,317 | (8.8) | 11,154,733 | (91.1) | –0– | |
| 12/31/72 | 110,973,179 | 1,921,455 | (8.5) | 20,583,921 | (91.4) | –0– | |
| 12/31/73 | 125,532,858 | 7,329,467 | (17.7) | 34,037,233 | (82.2) | –0– | |
| 12/31/74 | 142,548,158 | 11,007,309 | (22.5) | 36,739,258 | (75.2) | 1,054,926 | (2.1) |
| 12/31/75 | 148,007,855 | 12,833,966 | (16.4) | 34,863,213 | (57.3) | 13,078,000 | (21.5) |
| 12/31/76 | 164,341,348 | 17,494,951 | (23.1) | 42,802,305 | (56.7) | 15,182,706 | (20.1) |
| 6/30/77 | 70,289,788 | 7,061,933 | (20.5) | 18,838,844 | (54.9) | 8,393,350 | (24.4) |
| 6/30/78 | 183,780,626 | 12,777,833 | (16.5) | 39,174,781 | (50.4) | 25,633,587 | (23.0) |
| 6/30/79 | 251,810,159 | 23,473,758 | (16.7) | 70,039,556 | (50.4) | 46,452,921 | (33.1) |
| 6/30/80 | 276,741,000 | 26,822,000 | (16.6) | 71,717,000 | (44.6) | 60,752,000 | (37.8) |
| 6/30/81 | 296,479,000 | 30,304,000 | (17.1) | 78,754,000 | (44.5) | 51,553,000 | (29.1) |
| 6/30/82 | 339,528,000 | 37,810,000 | (21.9) | 96,702,000 | (56.0) | 42,099,000 | (24.4) |
| 6/30/83 | 399,724,000 | 40,310,000 | (23.3) | 100,107,000 | (58.0) | 31,980,000 | (14.5) |
| 6/30/84 | 429,319,000 | 46,401,000 | (22.8) | 110,657,000 | (54.4) | 46,001,000 | (22.6) |
| 6/30/85 | | | | | | | |

32. SEPTA has received additional federal operating subsidies for the commuter rail lines in the form of transition payments authorized by the Northeast Rail Service Act of 1981 as follows:

| Year | Amount |
|---|---|
| 1982 | 1,872,000 |
| 1983 | 25,923,000 |
| 1984 | 3,567,000 |

33. SEPTA has collected passenger revenues as follows:

| Year Ending | Amount (% of total revenue) | |
|---|---|---|
| 12/31/68 | 18,750,934 | (64.4) |
| 12/31/69 | 80,660,832 | (89.1) |
| 12/31/70 | 85,317,673 | (86.2) |
| 12/31/71 | 86,043,843 | (85.1) |
| 12/31/72 | 86,129,959 | (77.6) |
| 12/31/73 | 80,676,781 | (64.2) |
| 12/31/74 | 85,432,043 | (59.9) |
| 12/31/75 | 80,065,406 | (54.0) |
| 12/31/76 | 82,345,271 | (50.1) |
| 6/30/77 | 31,716,968 | (45.1) |
| 6/30/78 | 95,608,246 | (52.0) |
| 6/30/79 | 90,160,372 | (35.8) |
| 6/30/80 | 107,379,000 | (38.8) |
| 6/30/81 | 121,317,000 | (40.9) |
| 6/30/82 | 145,785,000 | (42.9) |
| 6/30/83 | 187,500,000 | (46.9) |
| 6/30/84 | 208,600,000 | (48.5) |
| 6/30/85 | | |

* Financial statements do not distinguish between operating and capital subsidies and do not include state and local payments to private transit companies operating service for SEPTA under purchase of service contracts.

**1568**

APPENDIX B

STIPULATION OF UNCONTESTED
FACTS SUBMITTED BY THE
PLAINTIFF

Plaintiffs and the Defendant, by their respective attorneys, hereby agree that the following statements are true and can be used in connection with this case as if the statements were admitted as true pursuant to Rule 36 of the Federal Rules of Civil Procedure:

1. Prior to 1968, neither the City of Philadelphia nor any other state or local governmental agency in Southeastern Pennsylvania operated any transit facilities, including the Broad Street Subway, the Market-Frankford Elevated, the commuter high-speed trains, trolleys and buses. All of these mass transit modalities were operated by private corporations.

2. SEPTA purchased the former Philadelphia Transportation Company ("PTC") and began operating the mass transit facilities of the former PTC in 1968.

3. As late as 1960, 95% of all transit companies in the United States were privately owned and operated. H.R.Rep. No. 204, 88th Cong., 2d Sess., reprinted in, [1964] U.S.Code Cong. & Ad.News 2569, 2590. *Kramer, et al. vs. New Castle Area Transit Authority,* 677 F.2d 308 (3d Cir. 1982).

4. Even after the passage of the Urban Mass Transportation Act of 1964, 49 U.S.C. § 1601, *et seq.,* by 1978 between 45 and 52% of all transit operations (regardless of size) were privately owned and operated. Department of Transportation, Urban Mass Transportation Administration, A Directory of Regularly Scheduled, Fixed Route, Local Rural Public Transportation Service, 6 (1980); U.S. Dep't of Transportation, Urban Mass Transportation Administration, A Directory of Regularly Scheduled, Fixed Route, Local Public Transportation Service, 17 (1979). *Kramer, et al. vs. New Castle Area Transit Authority,* 677 F.2d 308 (3d Cir.1982).

5. The Urban Mass Transportation Act (UMTA) provides federal funding as follows:

(a) capital grants, funded on an 80% federal/20% local matching basis;

(b) operating grants on a 50% federal/50% local matching basis; and

(c) technical assistance to local planning agencies on an 80% federal/20% local matching basis. 49 U.S.C. § 1601, *et seq.*

6. In the period of 1964 to 1983, UMTA has provided over $22 billion in mass transit aid to states and localities. Department of Transportation and Related Agencies Appropriations for 1983: Hearings before a Subcommittee of the House Committee on Appropriations, 97th Cong., 2d Sess., p. 808 (1982) (fiscal years 1965–1982); Census, Federal Expenditures 15 (fiscal year 1983). *Garcia v. San Antonio Metro. Transit Authority,* [469 U.S. 528] 105 S.Ct. 1005 [83 L.Ed.2d 1016] (1985).

7. During the period of 1964 until the present, SEPTA has been the recipient of Capital Grants and Operational Subsidies from the UMTA and other federal agencies. In addition, other state and local governmental agencies in Southeastern Pennsylvania have received Capital Grants from UMTA and other governmental agencies for improvements primarily for the use of SEPTA, such as the Center City Commuter Tunnel (linking the former Penn Central and Reading Commuter Trains) and the Airport High Speed Line (linking Center City with the airport).

8. By June 30, 1984 the UMTA had approved Capital Grants to SEPTA aggregating approximately $1,070,000,000 ($1.07 Billion). Of this aggregate amount, 80% ($856 Million) has or will be funded by the federal government, and 20% ($214 Million) has or will be funded by the state government. These amounts are exclusive of any Operating Subsidies given by UMTA to SEPTA.

9. SEPTA's Annual Reports for its Fiscal Years lists the following operating federal subsidies received:

| | |
|---|---|
| Fiscal Year 1984 | $46,001,000. |
| Fiscal Year 1983 | 31,980,000. |
| Fiscal Year 1982 | 42,099,000. |

| | |
|---|---|
| Fiscal Year 1981 | $51,553,000. |
| Fiscal Year 1980 | 60,752,000. |
| Fiscal Year 1979 | 46,452,921. |

10. For each of the following Fiscal Years, the contribution to the operating subsidies received by SEPTA were as follows:

| | | Percentage Contribution | | |
|---|---|---|---|---|
| Fiscal Year | Total Subsidy | Local | State | Federal |
| Fiscal Year 1984 | $203,059,000. | 23% | 54% | 23% |
| Fiscal Year 1983 | 172,397,000. | 23% | 58% | 19% |
| Fiscal Year 1982 | 176,611,000. | 21% | 55% | 24% |
| Fiscal Year 1981 | 160,611,000. | 19% | 49% | 32% |
| Fiscal Year 1980 | 159,291,000. | 17% | 45% | 38% |
| Fiscal Year 1979 | 139,966,235. | 17% | 50% | 33% |

11. In addition, SEPTA received funding from the Northeast Rail Services Act (NERSA), 45 U.S.C. § 1101 *et seq.*, for the transition of the Regional High Speed Line operation from Conrail to SEPTA. SEP-TA's Annual Reports list this funding as follows:

| | |
|---|---|
| Fiscal Year 1984 | $ 3,567,000. |
| Fiscal Year 1983 | 25,923,000. |
| Fiscal Year 1982 | 1,872,000. |